1

2
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
3
                                    .    Chapter 11
    IN RE:                           .
4                                    .    Case No. 18-11212(BLS)
    EBH TOPCO, LLC, *et al.*,         .
5                                    .    Courtroom No. 1
                                     .    824 North Market Street
6                                    .    Wilmington, Delaware 19801
                                     .
7                         Debtors.    .    June 26, 2018
    . . . . . . . . . . . . . . . . .      11:00 A.M.
8
                           TRANSCRIPT OF HEARING
9            BEFORE THE HONORABLE BRENDAN L. SHANNON
                    UNITED STATES BANKRUPTCY JUDGE
10

11
    APPEARANCES:
12
    For the Debtors:          Christopher Ward, Esquire
13                            Shanti Katona, Esquire
                              Stephen Astringer, Esquire
14                            POLSINELLI PC
                              222 Delaware Avenue, Suite 1101
15                            Wilmington, Delaware 19801

16

17
    Audio Operator:           Dana L. Moore
18
    Transcription Company:    Reliable
19                            1007 N. Orange Street
                              Wilmington, Delaware 19801
20                            (302)654-8080
                              Email:  gmatthews@reliable-co.com
21

22  Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.
23

24

25

```
 1   APPEARANCES (Continued):

 2   For the Debtors:          Jeremy Johnson, Esquire
                               POLSINELLI PC
 3                             600 3rd Avenue, 42nd Floor
                               New York, New York 10016
 4
     For the U.S. Trustee:     Hannah McCollum, Esquire
 5                             UNITED STATES DEPARTMENT OF JUSTICE
                               OFFICE OF THE U.S. TRUSTEE
 6                             844 King Street, Suite 2207
                               Lockbox 35
 7                             Wilmington, Delaware 19801

 8
     For David C. Johnson:     Morgan Patterson, Esquire
 9                             WOMBLE BOND DICKINSON (US) LLP
                               222 Delaware Avenue, 15th Floor
10                             Wilmington, Delaware 19801

11
     For the Committee:        Robert Hirsh, Esquire
12                             Jordana Renert, Esquire
                               ARENT FOX LLP
13                             1301 Avenue of the Americas
                               42nd Floor
14                             New York, New York 10019

15   For Project Build         David Agay, Esquire
     Behavioral Health:        MCDONALD HOPKINS LLC
16                             300 N. LaSalle Street, Suite 1400
                               Chicago, Illinois 60654
17

18

19

20

21

22

23

24

25
```

1

INDEX

2
PAGE

3  Motion of Debtors for Interim and Final Orders Authorizing (I)
   Continued Use of Existing Cash Management System, Including
4  Maintenance of Existing Bank Accounts, Checks, and Business Forms,
   and (II) Continuation of Existing Deposit Practices [Docket No. 6;
5  Filed 5/23/2018]

6  ARGUMENT                                                    7

7  RULING                                                      8

8  Motion of Debtors for Entry of Interim and Final Orders Authorizing
   Payment of (I) Certain Prepetition Workforce Claims, Including
9  Wages, Salaries, and Other Compensation, (II) Certain Employee
   Benefits and Confirming Right to Continue Employee Benefits on
10 Post-Petition Basis, (III) Reimbursement to Employees for
   Prepetition Expenses, (IV) Withholding and Payroll-Related Taxes,
11 (V) Workers' Compensation Obligations, and (VI) Prepetition Claims
   Owing to Administrators and Third-Party Providers [Docket No. 7;
12 Filed 5/23/18]

13 ARGUMENT                                                    9

14 RULING                                                      11

15
   Motion of Debtors for Entry of Interim and Final Orders (I)
16 Prohibiting Utility Providers from Altering, Refusing, or
   Discontinuing Service, (II) Approving the Debtors' Proposed
17 Adequate Assurance of Payment for Post-Petition Services, and (II)
   Establishing Procedures for Resolving Requests for Additional
18 Adequate Assurance of Payment [Docket No. 9; Filed 5/23/2018]

19 ARGUMENT                                                    11

20 RULING                                                      11

21 Motion of Debtors for Entry of Interim and Final Orders Authorizing
   Payment of Pre-Petition Obligations Owed to Critical Vendors
22 [Docket No. 12; Filed 5/23/2018]

23 ARGUMENT                                                    12

24 RULING                                                      12

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

First Omnibus Motion for Entry of an Order (I) Authorizing the
Debtors to Reject Certain Executory Contracts and Unexpired Leases
Nunc Pro Tunc to the Petition Date, and (II) Granting Certain
Related Relief [Docket No. 23; Filed 5/23/2018]

ARGUMENT                                                    13

RULING                                                      14

Application of Debtors for Authority to Employ and Retain
Polsinelli PC as Counsel to the Debtors Nunc Pro Tunc to the
Petition Date [Docket No. 78; Filed 6/5/2018]

ARGUMENT                                                    14

RULING                                                      15

Application of Debtors for Entry of an Order (I) Approving the
Retention and Employment of Donlin, Recano & Company, Inc. as the
Administrative Agent for the Debtors, Effective Nunc Pro Tunc to
the Petition Date, and (II) Granting Related Relief [Docket No. 80;
Filed 6/5/2018]

ARGUMENT                                                    15

RULING                                                      16

Motion of Debtors to (I) Retain Alvarez & Marsal Healthcare
Industry Group, LLC to Provide the Debtors a Chief Restructuring
Officer and Certain Additional Personnel, and (II) Designate Martin
McGahan as Chief Restructuring Officer for the Debtors, Nunc Pro
Tunc to the Petition Date [Docket No. 81; Filed 6/5/2018]

ARGUMENT                                                    16

RULING                                                      17

Motion of Debtors for Entry of an Order Authorizing the Debtors to
(I) Maintain, Administer and Modify Client Refund Programs and
Practice, and (II) Honor Obligations Related Thereto [Docket No.
82; Filed 6/5/2018]

ARGUMENT                                                    17

RULING                                                      18

Application of Debtors for Entry of an Order (I) Authorizing the Employment and Retention of Houlihan Lokey Capital, Inc. as Investment Banker to the Debtors, Nunc Pro Tunc to the Petition Date, (II) Waiving Certain Time-Keeping Requirements Pursuant to Local Rules, and (III) Granting Related Relief [Docket No. 84; Filed 6/6/2018]

ARGUMENT                                                    18

RULING                                                      19

Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Secured Post-Petition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Setting a Final Hearing, and(VI) Granting Related Relief [Docket No. 15; Filed 5/23/2018]

Motion of Official Committee of Unsecured Creditors for an Order, Pursuant to Section 105(a) of the Bankruptcy Code, Bankruptcy Rule 2004, and Local Bankruptcy Rule 2004-1, Authorizing and Directing the Examination of Certain Third Parties [Docket No. 161; Filed 6/22/2018]

1          (Proceedings commenced at 11:16 a.m.)

2          (Call to order of the Court)

3                THE COURT:  Please be seated.  Good morning.

4                Mr. Ward, good morning.

5                MR. WARD:  Good morning, Your Honor; for the

6    record Chris Ward of Polsinelli on behalf of the debtors.

7                Your Honor, we filed an amended agenda this

8    morning.

9                THE COURT:  I have it.

10               MR. WARD:  I'm hoping you got that with some

11   additional matters on there and status of where we're at.

12               THE COURT:  Yup.

13               MR. WARD:  We are here today on our second-day

14   hearing.  The court has entered orders on the first three

15   matters related to the Patient Care Ombudsman and our second

16   omnibus motion to reject.  We appreciate that.

17               We are going to hand-up revised forms of order and

18   walk the court through orders on everything else except for

19   the DIP and the 2004.

20               THE COURT:  Okay.

21               MR. WARD:  So, I suggest we take those last.

22               THE COURT:  Sure.

23               MR. WARD:  There's not an agreement on several

24   terms of the DIP.  So, that is going forward on a contested

25   basis.

1              THE COURT:  Okay.

2              MR. WARD:  And we'll have to walk through the 2004

3    motion.

4              THE COURT:  Very good.

5              MR. WARD:  So, I will cede the podium to Ms.

6    Katona for the second-day orders.

7              THE COURT:  Okay.  Yeah, I also wanted to mention

8    just a scheduling issue.  I have a commitment at 12:30.  So,

9    if we are not done then we'll break and we'll reconvene at

10   1:30.  I just want to let folks know that.  Okay.

11             MR. WARD:  Thank you, Your Honor.

12             THE COURT:  Ms. Katona.

13             MS. KATONA:  Good morning, Your Honor; Shanti

14   Katona of Polsinelli, proposed counsel to the debtors.

15             May I approach, Your Honor?

16             THE COURT:  Sure.  Thank you.

17             MS. KATONA:  Your Honor, I've handed up both

18   redlines and originals of all of the motion orders that we

19   have going forward today with the exception, as Mr. Ward

20   noted, of agenda item number 8 and then the last one, 17,

21   which is the DIP and the 2004 motion.

22             THE COURT:  Very good.

23             MS. KATONA:  So, for the first redline that you

24   have in front of you, Your Honor, is agenda item 4 which is

25   the final cash management order.

1      We had a few comments from the committee as well

2  as the Office of the United States Trustee prior to the

3  first-day hearing.  We've incorporated all of those edits

4  from the version that was filed on the docket.  We've made

5  the committee a notice party with respect to any new accounts

6  that we end up opening or closing.  And then also the

7  committee had some language that they wanted the debtors to

8  add in with respect to intercompany transactions, which we

9  have added; that's Paragraphs 4 and 5.

10      So, unless Your Honor has any questions.

11      THE COURT:  I'd ask if anyone else wishes to be

12  heard with respect to the request for a final order.

13      (No verbal response)

14      THE COURT:  Very well.  All right.  I've had an

15  opportunity to review the blackline.  I'm satisfied that the

16  -- and I appreciate counsel walking me through.  I am

17  satisfied that the relief requested is appropriate and

18  warranted.

19      I would note that I have previously entered an

20  interim order at the first-day hearing.  I would incorporate

21  my record from the prior hearing as well as the declaration

22  of the affiant for purposes of establishing the evidentiary

23  predicate.

24      The motion is granted. The order will issue.

25      MS. KATONA:  Thank you, Your Honor.

1          Your Honor, the next item on the agenda is agenda

2    item number 5 which is the final wage order.

3          THE COURT:  Right.

4          MS. KATONA:  And, Your Honor, we didn't have any

5    substantive changes compared to what we filed on the docket

6    for the final order.  One thing I did want to bring to Your

7    Honor's attention is we did make a few conforming edits that

8    the U.S. Trustee had brought to our attention prior to the

9    first-day hearing with respect to that the debtors are

10   obliged to pay certain payments and, obviously, we are;

11   that's why we're seeking authority under this order.

12          The other issue that was brought-up by the Office

13   of the United States Trustee is with respect to the incentive

14   program.  Your Honor, we submitted a declaration by Mr.

15   McGahan yesterday with respect to the incentive program.

16          THE COURT:  I have it.

17          MS. KATONA:  Okay.  Where we highlighted for the

18   court the importance of two particular employees who are on

19   par to receive or on tab to receive amounts in excess of the

20   cap.  And we just wanted to ensure that there was notice

21   provided that those two employees for their prepetition

22   amounts owed would be receiving amounts in excess of the cap.

23          THE COURT:  Sure.  Let me ask, Ms. McCollum, does

24   -- I assume you've had an opportunity to review the

25   declaration.  I understand that issues of bonuses and

1  prepetition bonuses are often a hot topic both for your

2  office and for the court.  Do you have any concerns or do you

3  wish to cross-examine Mr. McGahan?

4          MS. MCCOLLUM:  Your Honor, Hannah McCollum for the

5  U.S. Trustee.

6          I do not have any concerns.  I do not wish to

7  cross-examine.  The debtors have made it very clear that

8  these two employees are very critical.  They are, as far as I

9  can tell, non-insider employees and so our office is not

10 taking a position other than not objecting to the order.

11         THE COURT:  Very well.  Okay.

12         Does anyone else wish to be heard with respect to

13 the debtors' request for a final order relating to employee

14 wages and benefits?

15     (No verbal response)

16     THE COURT:  Very well.  Based upon the record before me

17 I will approve and authorize the relief on a final basis.  In

18 so ruling, as I did previously, I will incorporate the

19 court's record from the prior hearing on, essentially, the

20 interim relief.  In a specific observation I will note that

21 the court also relies upon the information contained in Mr.

22 McGahan's supplemental declaration which is admitted.  No

23 party has requested to cross-examine Mr. McGahan with respect

24 to the contents of that declaration.

25         So, I will approve and authorize the relief.  I

1  will make a specific finding that to the extent that the

2  bonus payments for the two individuals identified in the

3  declaration exceed statutory priority caps I'm satisfied that

4  the record is sufficient to warrant that.  That motion is

5  granted.  The order will issue.

6          MS. KATONA:  Thank you, Your Honor.

7          The next item on the agenda is agenda item 6 which

8  is the utilities motion.  Again, there were a few edits that

9  were brought to our attention from the committee which is

10 making them a notice party to the extent that any utility

11 provider seeks additional adequate assurance.  And also, Your

12 Honor, we did have a few informal comments from some utility

13 providers.  And so the number that you see in Paragraph 3 has

14 increased slightly to account for that.

15         THE COURT:  Okay.  Does anyone else wish to be

16 heard?

17     (No verbal response)

18     THE COURT:  Very well.  Based upon the record before me

19 the debtor has carried its burden under Bankruptcy Code

20 Section 366 for purposes of approval of procedures relating

21 to utility service providers.  As I found at the first-day

22 hearing, and I will find again today, the relief requested is

23 standard in this jurisdiction and strikes an appropriate

24 balance between the needs of the debtor for uninterrupted

25 utility services and the rights to adequate assurance of

1  utility service providers.

2            This motion is granted.  The order will issue.

3            MS. KATONA:  Thank you, Your Honor.

4            The next agenda item is number 7 which is the

5  critical vendor motion.  Your Honor, we made some conforming

6  Changes that were brought to our attention prior to the

7  first-day hearing from the Office of the United States

8  Trustee.

9            Then we also, Paragraph 17 was an edit by the

10  committee where we are going to be providing an accounting to

11  the committee to the extent that there are certain payments

12  in excess of $100,000 dollars as well as an accounting once a

13  month for all the payments made in the month prior.

14            THE COURT:  Okay.  All right.  Can I ask if anyone

15  else wishes to be heard with respect to the entry of a final

16  order relating to critical vendors?

17       (No verbal response)

18       THE COURT:  Very well.  I've had an opportunity to

19  briefly review the blackline which reflects the comments

20  described by counsel and presumably negotiated and requested

21  by the committee.  As noted, the court has previously entered

22  an interim order and I am satisfied that the record is

23  sufficient to authorize the entry of a final order on the

24  relief.

25            This motion is granted.  The order will issue.

1            MS. KATONA:  Thank you, Your Honor.

2            The next item is agenda item number 9 which was

3    the debtors' motion to reject certain executory contracts and

4    leases as of the petition date.  We did not have any

5    objections with the exception of Mr. David Johnson who did

6    raise a concern about *nunc pro tunc* to the petition date

7    rejection.  So, we have two orders in front of Your Honor;

8    one that removes him from the one that allows us to reject to

9    the petition date and the second order which also adds in

10   some language ensuring that any property that was abandoned

11   at the premises is, in fact, abandoned.

12           THE COURT:  Okay.

13           MS. KATONA:  And it's effective as of today, the

14   other change.

15           THE COURT:  And this is -- so, the second order,

16   which I have in your stack, relates specifically to Mr.

17   Johnson and the location in (indiscernible 11:23:27).

18           Is Mr. Johnson present in the courtroom or is

19   anyone here today on his behalf?

20           Counsel.

21           MS. PATTERSON:  Good morning, Your Honor; Morgan

22   Patterson from Womble Bond Dickinson on behalf Mr. Johnson.

23           We are in agreement with this order.  We thank the

24   debtors for working with us and working on that *nunc pro tunc*

25   issue and the abandonment of the property.

1        THE COURT:  Very well.

2        MS. PATTERSON:  Thank you, Your Honor.

3        THE COURT:  Okay.  Does anyone else wish to be

4  heard with respect to the request for authority to reject

5  certain contracts *nunc pro tunc*?

6        (No verbal response)

7        THE COURT:  All right.  I am satisfied the debtors

8  have carried their burden as to the relief requested and

9  specifically as to the request for *nunc pro tunc* relief.  I

10  do find that the relevant and applicable standards in this

11  jurisdiction have been met.  I think they've generally been

12  referred to as the Namco standards going back 20 some odd

13  years to Judge Walsh.

14        Nevertheless, case law does teach that under

15  Bankrutpcy Code Section 365 the burden upon a debtor to

16  demonstrate an entitlement to rejection of an executory

17  contract is not a heavy burden.  The debtors have

18  demonstrated that the rejection is consistent with the

19  exercise of their best business judgment.

20        This motion is granted.  The order will issue or

21  both orders will issue.

22        MS. KATONA:  Thank you, Your Honor.

23        THE COURT:  Sure.

24        MS. KATONA:  The next item on the agenda is number

25  10 which is the employment and retention of Polsinelli.  We

1    had one edit from the Office of the United States Trustee

2    which you will see in Paragraph number 4, which is just

3    bringing in the language relating to the large fee cases

4    which, obviously, applies in this case.  So, we have made

5    that edit.

6                THE COURT:  Sure.  Okay.

7                MS. KATONA:  We had no other comments or

8    objections.

9                THE COURT:  All right.  Does anyone wish to be

10   heard with respect to the Polsinelli retention?

11        (No verbal response)

12               THE COURT:  Very well.  Based upon the record

13   before me the debtors have carried their burden under

14   Bankrutpcy Code Section 327, 328, 330 and 331 for purposes of

15   retention of debtors' counsel.

16               This motion is granted.  The application will

17   issue.

18               MS. KATONA:  Thank you, Your Honor.

19               Agenda item number 11 is next which is the interim

20   compensation order.  This is the standard order that we

21   excluded some important language when we filed the proposed

22   form of order which has been rectified.  We've added in the

23   committee and lender's counsel as notice parties.  Also, Your

24   Honor, the United States Trustee wanted to ensure that any

25   party had the opportunity to object to the monthly fee

1 applications.

2          THE COURT:  Of course.  Okay.

3          Does anyone wish to be heard with respect to the

4 order relating to interim comp?

5     (No verbal response)

6          THE COURT:  Okay.  I do note that this is a

7 procedure that this court has used for many, many years and

8 I'm satisfied that the procedure that's built into the form

9 of order submitted by counsel is consistent with that which

10 the court has entered on previous cases, and that it is

11 appropriate and warranted.

12          This motion is granted.  The order will issue.

13          MS. KATONA:  Thank you.

14          The next agenda item is number 12 which is the

15 Donlin Recano retention as administrative agent for the

16 debtor effective as of the petition date.

17          THE COURT:  Did I not approve this at the outset?

18          MS. KATONA:  That was the claims agent.

19          THE COURT:  Oh.

20          MS. KATONA:  Your Honor, this was -- we didn't

21 have any comments other than from the Office of the United

22 States Trustee which you will see in Paragraph number 9

23 relating to the indemnification contribution reimbursement

24 language being added.

25          THE COURT:  Okay.  Can I ask if anyone wishes to

1  be heard with respect to Donlin Recano's retention as

2  administrative agent for the debtor?

3      (No verbal response)

4          THE COURT:  The court -- as reflected in the

5  docket the court has previously entered an order authorizing

6  Donlin to serve as claims and noticing agent.

7          Based upon the record before me I'm satisfied that

8  the relief requested is appropriate and warranted.  This

9  motion is granted.  The order will issue.

10         MS. KATONA:  Thank you.

11         Agenda item number 13 is the Alvarez & Marsal

12  retention order as well as designating Mr. McGahan as the

13  chief restructuring officer *nunc pro tunc* to the petition

14  date.

15         Your Honor, we had some comments from the Office

16  of the United States Trustee requesting some indemnification

17  language as well as some clarification language.  You'll see

18  it in Paragraph 3(e) with respect to how time entries will be

19  maintained through the course of the case.

20         THE COURT:  Okay.

21         MS. KATONA:  As well as a few edits to the actual

22  engagement letter, itself, just ensuring that any fees need

23  to be sought through the bankruptcy case either, you know,

24  affixed to the end of the fee application.

25         Then there was one clarifying edit which was there

1  is a 3 percent in-house administrative expense fee that was

2  built-in which the Office of the United States Trustee

3  requested that we strike from the engagement letter.  That is

4  also in Paragraph 3(e).

5            THE COURT:  That's built-in to 3(e)?

6            MS. KATONA:  Yeah.

7            THE COURT:  Okay.  I see that provision.

8            All right.  Can I ask if anyone else wishes to be

9  heard with respect to the Alvarez engagement?

10       (No verbal response)

11            THE COURT:  All right.  I appreciate counsel

12  walking me through the modifications and to the extent I

13  haven't already noted it -- I know I did at the first-day,

14  but I would express the court's appreciation to the Office of

15  the United States Trustee and, of course, the committee for

16  their review of these materials and negotiations in advance

17  of today's hearing to resolve any open issues.

18            Based upon the record before me I'm satisfied that

19  the relief requested is appropriate and warranted, and that

20  Alvarez & Marsal is eligible to provide the services that are

21  identified in the application and provided for in the order.

22  This motion is granted.  The order will issue.

23            MS. KATONA:  Thank you.

24            The next agenda item is number 14 which is the

25  debtors' motion seeking to maintain, and authorize and

1  administer the client refund program.  Your Honor, we shared

2  this proposed form of order with the committee as well as the

3  Office of the United States Trustee.  The Trustee's primary

4  concern was insuring that to the extent this program is

5  terminated or modified that there is notice and it does not

6  happen without court approval.

7          THE COURT:  Okay.

8          MS. KATONA:  Then we've added in the committee as

9  a notice party insuring that any accounting payments that are

10 made are accounted for and reported to the committee in the

11 subsequent month.

12          THE COURT:  Great.

13          Can I ask if anyone wishes to be heard with

14 respect to the debtors' motion to maintain and implement

15 client refund programs and practices?

16     (No verbal response)

17          THE COURT:  Very well.  I think consistent with

18 the court's prior observations in connection with the first-

19 day hearing I'm satisfied that this relief is appropriate and

20 warranted.  Specifically, the goal in the context of a sale

21 case is to maintain the value of the business on a going

22 forward basis and to minimize disruption.  So, ensuring that

23 client expectations are honored and respected is, I think,

24 central to that process.  In so ruling I rely upon Mr.

25 McGahan's declaration.

1        I'm satisfied the relief requested is appropriate

2   and warranted, as I said, under the circumstances before me.

3   This motion is granted.  The order will issue.

4        MS. KATONA:  Thank you, Your Honor.

5        The next item is the Houlihan Lokey retention

6   application as investment banker to the debtors.

7        THE COURT:  Yup.

8        MS. KATONA:  Your Honor, the Office of the United

9   States Trustee had some comments to ensure that we

10  incorporated some language from -- the Planet Hollywood

11  language into the actual provisions of the order.  Then also

12  I believe that the committee wanted to make a statement on

13  the record with respect to the monthly fees that are being

14  sought through the engagement letter.

15       THE COURT:  Okay.  Counsel.

16       MS. RENERT:  Good morning, Your Honor; Jordana

17  Renert of Arent Fox on behalf of the official committee.

18       The committee originally had some reservations

19  about the monthly fee structure.  We now understand that

20  Houlihan has agreed that if the company is sold on July 19th

21  they will not seek a monthly fee payment after that date

22  unless they are continuing to do work beyond light

23  monitoring.  Such agreement resolves the committee's

24  objection.

25       THE COURT:  Okay.  Very good.

1          All right.  Does anyone else wish to be heard with

2   respect to the Houlihan retention?

3        (No verbal response)

4          THE COURT:  Okay.  I appreciate the clarification

5   on the record of the terms under which the monthly fees will

6   be paid.  I've had an opportunity to review the application

7   and the engagement letter.  Again, I appreciate the

8   engagement by the committee and the Office of the United

9   States Trustee with respect to clarifying or negotiating

10  certain provisions of the engagement that result in what is,

11  effectively, an agreed form of order.

12         The debtors have carried their burden with respect

13  to the retention and engagement of Houlihan Lokey as their

14  investment banker.  This application is granted.  This order

15  will issue.

16         MS. KATONA:  Thank you, Your Honor.

17         Last is agenda item number 16 which is the

18  debtor's motion seeking the retention and payment of certain

19  ordinary course professionals.

20         Your Honor, you'll see in the redline there are

21  actually are some substantive changes.  The Office of the

22  United States Trustee wanted to ensure that there was an

23  opportunity that to the extent any of the retained ordinary

24  course professionals exceeded their allotted $25,000 dollar

25  cap that there was an opportunity for a notice and objection

1  period to pass before any payments in excess of that were

2  actually made.  Additionally, there is the requirement that

3  we provide quarterly reporting as to the payments that are

4  made with respect to the ordinary course professionals.

5           THE COURT:  Okay.  I think both of those are

6  pretty standard elements of an ordinary course professional

7  engagement.

8           Does anyone wish to be heard with respect to the

9  proposed procedures for retention and payment of ordinary

10 course professionals?

11      (No verbal response)

12          THE COURT:  Very well.  Based upon the record

13 before me I'm satisfied the debtors have carried their burden

14 as to the relief requested.  I do find that procedures that

15 are identified will ease the burden on the debtor and,

16 frankly, on the professionals themselves thereby saving money

17 for the estate in terms of those professionals that are

18 providing non-bankruptcy services to these debtors during the

19 pendency of the cases subject to the caps.

20          So, I do believe that the procedure is

21 appropriate.  I think it's consistent with what has been

22 entered and approved in this court on many prior cases.  The

23 motion is granted.  The order will issue.

24          MS. KATONA:  Thank you, Your Honor.

25          I think we've left exactly 55 minutes now.

1              THE COURT:  All right.

2              MR. WARD:  Your Honor, what is your preference for

3    order of taking the 2004 and the DIP?  I think the DIP

4    probably comes first given some of the timing issues in

5    there.

6              THE COURT:  Yeah.  I would deal with it with the

7    DIP first.

8              MR. WARD:  Okay.  I'll let Mr. Johnson handle

9    that.

10             THE COURT:  Mr. Johnson.

11             MR. JOHNSON:  Thank you, Your Honor; Jeremy

12   Johnson from Polsinelli on behalf of the debtor.

13             Your Honor, we've made certain accommodations and

14   certain amendments to the proposed DIP and we do have a

15   redline of the final order, but there are a number of issues

16   with the committee that remain unresolved.

17             So, Your Honor, I can address that they filed an

18   objection with a, sort of, number of objections.  We can,

19   sort of, go down the line and talk about those or --

20             THE COURT:  I think it would probably be -- if you

21   want to go through their objection I think at Pages 4 through

22   8 identify a series of substantive issues and concerns.  And

23   I do know that the parties have been in discussions.  So, I

24   am satisfied if you want to walk through that; that would

25   probably be the most efficient way.

1          The main purpose of the exercise, at least, at the

2   outset from my point of view is to understand those

3   objections that are live, those objections that are resolved

4   and, again, to get some sense of what the bid and the ask are

5   on some of these issues.  And we'll go from there.

6          MR. JOHNSON:  Okay.  Your Honor, starting with

7   Page 4, the very first one is a sale related termination of

8   event and events of default.  Your Honor, we believe that the

9   tying of certain sale related events, the DIP milestones, is

10  very common.  There is nothing improper about this, Your

11  Honor.  It just so happens that our stalking horse purchaser

12  is, in fact, our prepetition lender and our DIP lender.  So,

13  the tying of those milestones, Your Honor, in and of

14  themselves we don't think creates any sort of unique problem

15  or issue.

16         There is significant discussion regarding the

17  credit bidding, Your Honor.  In this case there is a credit

18  bid, yes, and it involves a bid of both the DIP money as well

19  as a portion of the prepetition amount, but importantly, Your

20  Honor, number one, it's not a credit bid for the entire $145

21  million dollars, right, which would have been -- potentially,

22  I could see it as being objectionable because the price is

23  overwhelming at that point, Your Honor.

24         THE COURT:  You run into a _Fisker_ issue.

25         MR. JOHNSON:  Exactly, which is why we made those

1   provisions.  I think, Your Honor, and I'm not going to speak

2   for our stalking horse purchaser, but that's why they picked

3   the number that they picked; a fairly reasonable number

4   relative to the total amount of the DIP, Your Honor, because

5   it is a $130 million dollars in prepetition debt plus the

6   $14.9 million dollars under the DIP.  So, it's a significant

7   number.

8          We think, Your Honor, that this number is in line

9   with -- this number is in line, frankly, with the prepetition

10  process that was run by the company.  So, we do expect there

11  to be a lot of interest, Your Honor, and there has been a lot

12  of interest so far.  We don't think there's been any

13  chilling.  I think there is something like 22 parties in the

14  data room.  Houlihan is on the line; they can probably

15  address some of those issues, but this isn't a case, Your

16  Honor, where everybody is looking at this and running scared.

17  There is a lot of interest from a lot of different parties.

18          THE COURT:  Well, I think I'd like -- you know,

19  I've read the objection and I've read the DIP order, but,

20  again, a lot of times looking at those provisions,

21  particularly in the order and the credit agreement, are like

22  reading the dictionary.  So, I will be candid; the primary --

23  while I -- I don't disagree with you, Mr. Johnson, that the

24  relief requested and the provisions are not remarkable.  It

25  raises a little bit of a concern that the purchaser is the

1  stalking -- the stalking horse is the DIP lender, is the

2  senior secured creditor.  Certainly also not the first time.

3            The committee, the U.S. Trustee and the court are

4  obliged to ensure that while we recognize this, and there's

5  certainly been adequate disclosure and that the threshold

6  requirement, that those circumstances, while not in and of

7  themselves illegal or objectionable, that they are not

8  positioned to preclude the honest, open and fair marketing of

9  these assets.

10           Again, I make no comment about who may come in or

11  how much comes in.  All I care about is the sufficiency and

12  adequacy of the process.  So, for example, one of the

13  concerns I have, and it's -- I could parse through the

14  language, but it's just helpful sometimes to get clarity on

15  the record.

16           One of the concerns that I read from the committee

17  objection is that the exercise that the either default EOD

18  events or termination events that the DIP lender enjoys,

19  which, again, I don't regard as terribly remarkable, are

20  susceptible to use in and during a bidding process for the

21  lender to say, you know something, you've actually -- the bid

22  deadline -- here's a typical example; the bid deadline is the

23  15th of July and on the 16th of July a bid winds-up on Mr.

24  Ward's desk.  Mr. Agay is entirely within his rights to say

25  you can't consider that.  Everyone in this room knows that

1  Mr. Hirsh will tell Mr. Ward that he better call his carrier

2  if he chooses not to look at it.  So, he's going to look at

3  it.  That's a discussion.  I get that, but if Mr. Agay goes

4  and the other thing is I'm terminating your DIP then you'll

5  have me on the phone very promptly.

6          MR. JOHNSON:  We'll be down very quickly, Your

7  Honor.

8          THE COURT:  Yes.  So, the question is does that

9  give him that right?  That is simply an example, all right,

10  because that's my concern.

11          I teach a course at St. John's with Judge Carey

12  that is the sales course.  We teach in the LL.M program.  The

13  thing that we always ask the kids is do you know what my

14  percentage is on these sales.  They look and sometimes they

15  say 30 percent which if it was I wouldn't be talking to you.

16          (Laughter)

17          THE COURT:  So, I don't care what the number is.

18  I don't get any of it.  It's not my money.  Frankly, there

19  are fiduciaries, and professionals and folks with their own

20  skin in the game.  All I care about is the process.

21          The theme of the concern, particularly as it

22  relates to some of these issues, is that the process it may

23  not be intended that it could be derailed or impacted by the

24  exercise of a DIP lender's rights, but that's the concern.

25  So, how do I deal with that?

1        MR. JOHNSON:  Well, Your Honor, I think, for

2   example -- and I know we can't address every single

3   situation, but in that particular situation the DIP provides

4   for five business days before any default can be -- before

5   any lifting of the automatic stay or anything like that.  So,

6   in that situation, of course, we'd be down in front of Your

7   Honor, we'd be working on these things.  And I don't know

8   that there would be any sort of active default at that time

9   anyway simply by considering the late bid or something like

10  that.  The debtor still retains discretion under the bid

11  procedures to do that.

12        Your Honor, I think in light of the fact that

13  these are relatively typical provisions -- I mean, for

14  example, Your Honor, one of the objections is, well, they

15  want to keep funding under the DIP if we choose an

16  alternative purchaser.  Well, Your Honor, I don't think the

17  DIP lender -- the DIP lender is doing this and funding this

18  case in an effort to acquire this company.  So, the DIP

19  lender is going to continue funding.

20        THE COURT:  I understand.

21        MR. JOHNSON:  If we pick a different purchaser

22  we're responsible for finding funding from that purchaser.

23        THE COURT:  Right.  And maybe I'm being hyper-

24  technical, but the concern is that if this -- what day is

25  your option?

1          MR. JOHNSON:   July 19th.

2          THE COURT:   What day is the day sale hearing?

3          MR. JOHNSON:   19th.   So, the 16th bids are due;

4    18th is the option; 19th is the sale hearing.

5          THE COURT:   So, your point would be, as a

6    practical matter, if the debtor on the 18th says I've chosen

7    another bidder at that point, I think, since they've chosen

8    to enter into but have not received my approval, right, of an

9    alternative transaction the DIP, itself, would be terminated.

10   So, any competing bid would have to, basically, provide for a

11   DIP.

12         MR. JOHNSON:   That's correct, Your Honor.   I mean

13   it's anticipated.   Look, this isn't the kind of case -- this

14   is a healthcare case.   So, there are patients, there are

15   permits, there are licenses.   So, this isn't a case where

16   July 19th if Your Honor approves a sale we close on July

17   20th.

18         One of the issues we'll address throughout this,

19   Your Honor, is we extended the maturity date and the end of

20   the DIP from August 10th to August 31st, but, frankly, Your

21   Honor, it might change.   It might look very different

22   depending on how the sale process goes.

23         This is not a simple case.   We have a lot of folks

24   that are looking at different pieces of the assets and

25   there's even a possibility that our current stalking horse

1  purchaser may not take every single asset that's there.  So,

2  there will need to be -- that's why, Your Honor, there's a

3  commitment to figure out the wind down, but we can't agree on

4  what a wind down budget is because we don't know what the

5  final transaction is going to look like.  This isn't your

6  typical case with one facility and it's a fairly straight-

7  forward deal.

8          We think there is going to be a lot of

9  permutations here, Your Honor.  There is going to be a lot of

10  activity the week of the 16th.  So, we may end up having some

11  facilities that don't get taken and we need to remarket them.

12  So, we may need to figure out a funding process for that.  If

13  everything gets taken by the stalking horse purchaser and

14  they close on everything by August 31st, Your Honor, it's

15  fairly simple and straight-forward; although, we have to deal

16  with a bunch of regulatory approvals.  There are 63 permits

17  and licenses that need to be transferred as part of the

18  operations of the facility.  We, obviously, operate in

19  several states.

20          So, Your Honor, there's a lot of uncertainty as to

21  what's going to happen as part of the sale process and what

22  the final deal is going to look like.  So, I think that we

23  need to maintain -- from the debtors' perspective we've been

24  pushing to maintain flexibility or, to use the consultant's

25  words, optionality to be able to, sort of, figure out what we

1 need to do and how we're going to need to pivot if and when

2 that becomes necessary.

3          So, that is part of what we have here, but, Your

4 Honor, yes, it's something that we're telling bidders and

5 bidders understand that if an alternative purchaser or group

6 of purchasers comes in we're either going to re-negotiate the

7 loan for the stalking horse purchaser to act as a DIP lender

8 going forward or those parties are going to have to provide

9 financing during this process because the close is going to

10 take, you know, several weeks, Your Honor, we think.

11          Your Honor, frankly, there may be interim

12 management agreements or something like that that may get

13 entered into at that time.  There's a lot of different things

14 that are potentially going to happen by the end of the sale

15 process.

16          THE COURT:  Mr. Agay.

17          MR. AGAY:  (Indiscernible), Your Honor.

18          THE COURT:  Well, currently they're Mr. Hirsh's

19 concerns.

20          MR. AGAY:  Good morning, Your Honor; David Agay

21 from McDonald Hopkins on behalf of Project Build.

22          I don't want to undercut Mr. Johnson.  I think he

23 was doing a great job in explaining the structure of the

24 transaction, but I think we can cut some of this short and I

25 can address some of your concerns, Your Honor.

1          Obviously, we would not be doing this DIP if we

2   weren't buying the assets.  So, it's important to us from an

3   economic perspective to tie the two transactions together.

4   As Mr. Johnson said, if they pick an alternative bidder it's

5   important to us that that bidder be able to fund the cases on

6   a go-forward basis for all the obvious reasons.  That is why

7   we structured the DIP as we did and we built all the

8   economics around that.

9          I also understand and hear Your Honor's concerns

10  around the process.  And true, we've tried to play this down,

11  and anticipate those concerns and play this down the middle.

12         The hypothetical, Your Honor, throughout, I think,

13  is addressed in the bid procedures in that the debtors

14  reserve the right to change the process, effectively, around

15  the exigency of the situation.  So, if they get an

16  alternative bid like a few hours after the bid deadline and

17  they decide to move forward I think we would be pretty

18  foolish to try to blow-up the case over that particular

19  issue.  Like Mr. Johnson said, they would be right in front

20  of Your Honor and Your Honor would say, yeah, they reserve

21  the right to change the bid rules and I think there's cause

22  here; therefore, I don't find that there's a default.

23         We understand the realities of that situation.  I

24  think given the commitment you made to fund the cases and to

25  serve as a stalking horse I think Your Honor should take that

1    as a signal that we're not a frivolous purchaser here.  We

2    don't stand to earn a break-up fee in this case if it falls

3    apart.  So, --

4              THE COURT:  I'm aware.

5              MR. AGAY:  -- I can't see a situation where

6    because there was some technical default we would be blowing

7    up the case.

8              I think the other issue that's front and center

9    both in the DIP objection, the committee's DIP objection and

10   the 2004 motion is the issue around the credit bid; that has

11   already come up a couple of times.  And there is -- I can

12   see, Your Honor, being a concern from the committee's

13   perspective, well, what if they challenge our credit bit and

14   what if they cap our credit bid.  Well, right now there's a

15   cross-default under the DIP if our credit bid gets capped.

16             We've told Your Honor that as part of a resolution

17   of the Rule 2004 motion that we're willing to waive that

18   cross-default in the DIP itself so that if for some reason

19   before or after the sale the order gets entered Your Honor

20   caps our credit bid at some amount.  And that is tied to a

21   few other things that we've put in our response that we're

22   willing to waive that cross-default in the DIP itself.

23             We think that in combination all of these things

24   ensure the integrity of the process, Your Honor, while

25   preserving the economics that are important to us.  It makes

1   imminent sense under the circumstances.

2          THE COURT:  Can you explain to -- I appreciate

3   that.  Again, I'm not certain how much comfort the committee

4   will take from it, but it is helpful, again, to provide some

5   sort of blunt response to the specific questions.  I

6   understand that there are a host of technical issues in here

7   or technical provisions; that's the way these work, but one

8   of the -- I often find that candor with the parties before me

9   is particularly helpful.

10         MR. AGAY:  I appreciate that.

11         THE COURT:  And often it's just saying this is not

12  going to happen or this is not going to work and you should

13  know that in advance.  Again, one of the luxuries I have in

14  this position is that, you know, I have able and experienced

15  counsel that have done this before.  So, I have expectations

16  about what will happen.  To the extent not, then, again, I

17  think parties usually find it's pretty easy to get in touch

18  with me.

19         I think I'd like some clarity, and you're probably

20  the person to provide it, about the credit bid issue.  My

21  issue right now and my question is a mechanical one.  Your

22  liens are subject to challenge.  At this point I will parse

23  out the DIP verses the prepetition liens because the DIP --

24  and, again, I'll hear from the committee on these issues, but

25  I start from the proposition that your funding a business,

1  those monies are coming in to fund a business, I know where

2  they're going, I know where they came from.  I'm hard-pressed

3  to see something that would be a legitimate challenge to a

4  DIP if I entered the order, but we'll leave that aside.

5           The issue here is going to be the prepetition

6  liens -- and I'm assuming, again, that the parties have

7  figured out that the UCC-1's are probably all find so this is

8  whether or not there's a litigation challenge to it, is that

9  a fair assessment?

10          MR. AGAY:  That would be my -- yes.

11          THE COURT:  Okay.  So, and in the context of the

12 2004 part of your response is here's what we're willing to

13 do, but also this is not as urgent as it seems because we're

14 not closing until X date.  And I think I told you at the

15 outset that I've dealt with this issue many, many times in

16 sales and I won't shorten the time.  You're not asking me and

17 I appreciate that.

18          I think I'd like to understand how the sale

19 process plays out from the auction that you win to the sale

20 hearing where I approve it to the expiree of the committee

21 investigation period, which I believe will be subsequent to

22 that, to the closing.  How does that -- what happens if the

23 committee commences that action post -- you know, I bless it

24 and I say, you know, PBBH you're the winner.  The auction was

25 conducted fairly, the credit bid is subject to challenge, but

1  nevertheless except as highest and best under the debtors'

2  best business judgment.  I approve that.  I sign that order.

3  I'm sure it's going to have, you know, a block of text that's

4  going to say can't close until either you get the okay from

5  the committee or the period expires, et cetera.  I don't -- I

6  think I want to understand what your expectation of that

7  process is.

8          MR. AGAY:  Sure.  So, I see three scenarios on how

9  this marketing and auction process plays out; scenario one,

10 no competing bidders show-up and we go directly to a sale

11 hearing.  Scenario two, there is an auction and we prevail.

12 Scenario three, there's an auction and somebody else

13 prevails.

14          So, I think here what we're talking about is only

15 the first two scenarios assuming in scenario three there's no

16 credit bid.

17          THE COURT:  Right.

18          MR. AGAY:  So --

19          THE COURT:  Scenario three raises some issues

20 about proceeds which we can deal with.

21          MR. AGAY:  Right.  Exactly.

22          So, for those first two scenarios we are bidding,

23 at least our initial bid our $65 million dollars in value.

24 And let's say that there's an auction, and we go up and we

25 end up, pick a number, $70, $80, $90 million dollars in value

1  where we prevail.  The sale order that we would be asking

2  Your Honor to enter is going to say that the winning bid for

3  the assets is, let's call it, $90 million dollars.  Okay.

4             THE COURT:  Okay.

5             MR. AGAY:  To the extent that I decide to cap

6  their credit bid at the purchase price of the prepetition

7  debt then that consideration is going to be paid in the

8  credit bid of the DIP, the credit bid in the amount of the

9  purchase price of the prepetition debt plus the additional

10  cash increment to get up to that $90 million dollar number.

11             THE COURT:  Okay.

12             MR. AGAY:  And that will not be paid until

13  closing.  And we're telling Your Honor that that closing will

14  not occur until after the expiration of their 75-day

15  challenge period --

16             THE COURT:  Right.

17             MR. AGAY:  -- which is currently the lien

18  challenge period and we're saying can also be their credit

19  bid challenge period.

20             THE COURT:  Yeah, I think that makes sense.

21             MR. AGAY:  If they commence a challenge that is

22  unresolved as of the date of closing we can't close.  It's as

23  simple as that because we don't know if we're paying a cash

24  or credit bid.

25             THE COURT:  Does that then create a termination

1  event, a default?  My concern is that you're going to be in

2  the catbird seat that you're going to be able to shut the

3  company down because the committee has a pending request

4  that, you know, I haven't conducted a trial on at that point.

5  I'm not sure how I square that circle.

6        MR. AGAY:  I don't think a challenge creates a

7  default under the DIP, Your Honor.  I think there's an issue

8  about how they fund that challenge.  And we, just like any

9  other lenders, are very reluctant to see the proceeds of our

10 loan be used to challenge our liens and other things like

11 that, but I don't believe that a challenge, itself, is a

12 default under the DIP.  I don't know that Your Honor would

13 approve that.  So, I think it all ticks and ties together.

14       THE COURT:  Can I ask a question because this goes

15 to the committee's concern, I guess, about the mechanics of

16 the credit bid, et cetera.  Again, I would endeavor to avoid

17 a Fisker issue and it sounds like you've thought about that a

18 well.

19       How do you respond -- I haven't heard from the

20 committee yet, but I'll have you respond to them anyway.  How

21 do you respond to the concern about the conduct of an auction

22 with money that's not necessarily real?

23       MR. AGAY:  Well, it is what it is, Your Honor.

24 The bankrutpcy code permits credit bidding and, you know,

25 this is a sliding scale.  When do you, sort of, fall over

1  into _Fisker_ territory in terms of actually chilling the

2  auction.

3         You've heard from the debtors that under the

4  current paradigm for the marketing and auction process they

5  don't believe that there's any chilling of the bidding.

6  Right now the world believes that we're credit bidding.  I'm

7  sure, if necessary, they can get up and talk about all the

8  interest that they've had in the assets.

9         By the way, this is the second sale process.

10 There was one prepetition.

11        THE COURT:  There's always one prepetition.

12        MR. AGAY:  There's always one prepetition.

13        THE COURT:  It's usually robust and substantial.

14     (Laughter)

15        MR. AGAY:  Of course, Your Honor.  I have no doubt

16 it was here.

17        This is the second go around for these assets and

18 we're getting significant interest.  The world knows that

19 we're credit bidding.  Now they can go out and tell the

20 world, assuming that it was acceptable to the committee as a

21 resolution of the 2004 motion, that there's a potential for

22 our credit bid to get capped if there's a committee

23 challenge.  In that case we have to pay cash.

24        Now, the world is also going to understand that

25 assuming that there's no flaw in our debt or lien position

1  that cash is going to get round-trip to us up to the par

2  value in debt, but that's going to happen irrespective.

3  That's just a product of our place in the capital structure.

4  So, unless we agree to just haircut our debt today, which,

5  obviously, we're not going to do, it just is what it is, Your

6  Honor.

7         Everybody has known going into this case that that

8  is the reality.  I'm sure Houlihan has designed their process

9  around that issue to ensure that there's the most interest

10  possible.  As Your Honor has observed we didn't invent this

11  playbook.  I mean this is something that Your Honor has seen

12  before and happens all the time.

13         THE COURT:  I think I'd like to hear from the

14  committee in response.  We've covered a fair amount of

15  ground.  I think we started by trying to tick through.  I'll

16  hear from the committee unless, Mr. Johnson, you have

17  something to add.

18         MR. JOHNSON:  Your Honor, a few things on the

19  record.  I realize this is one substantial issue, but, again,

20  Your Honor, just --

21         THE COURT:  It crosses a number of the areas posed

22  by the committee.

23         MR. JOHNSON:  It does, Your Honor.  And to clarify

24  a few things some movement has occurred on the side of the

25  debtors and the DIP lender to try and resolve the committee's

1  objections is that, as mentioned, the closing and maturity of

2  the DIP has been extended out to August 31st.  There was a

3  cap, a proposed cap on the investigation portion of the

4  committee's carve-out of $25,000 dollars.  The committee

5  requested that that be increased to $100,000 dollars.  The

6  DIP lender has consented to an investigation budget of

7  $100,000 dollars.

8          The amount of the committee carve-out, Your Honor

9  -- the aggregate committee carve-out for all professionals

10 was originally proposed in the amount of $210,000 dollars has

11 been increased to $410,000 dollars.  Now, we don't have

12 agreement from the committee that those terms are necessarily

13 acceptable, but that movement has been made in an effort to

14 try and resolve the matter.

15          THE COURT:  What have you done?

16      (Laughter)

17          THE COURT:  That's usually the fire alarm, but I

18 don't care.

19          I'll hear from the committee.

20          Until somebody comes to get me out of here we'll

21 keep moving forward.

22          MR. HIRSH:  Robert Hirsh, Arent Fox, on behalf of

23 the committee.  Thank you.

24          So, I think, Your Honor, has honed in on some

25 substantially or significant issues that we have with the

1  process.  Just to respond to Mr. Agay, under their credit

2  agreement it is an event of default under the DIP if lien

3  challenges are brought.  That is in -- so, that's an

4  automatic DIP default just to let you know as of now.

5           Let me step back because I kind of want to tie-in

6  our concerns with the DIP.  And by the way, we're not

7  opposing a DIP.  We're perfectly understandable and Your

8  Honor knows from me, certainly, I wouldn't oppose a DIP if I

9  didn't have to, but the issue really is all tied together.

10          Our concern is really not the DIP as much as the

11 entire process.  When I say the process I really am focusing

12 in on the sale process.  We're looking forward past the

13 actual auction.  We want there to be a return to creditors.

14 Where we see this case, unfortunately, is it's in no man's

15 land.  We see a return, for sure, to an entity that acquired

16 the debt at, we believe, a discount a week before the filing.

17 And that same entity or an affiliate thereof was involved

18 with the company, and I'll say before the debtor was ever a

19 debtor, prepetition --

20          THE COURT:  Hang on.

21          COURT OFFICER:  We have to leave now.

22          THE COURT:  Thank you, officer.

23          I'll tell you what, we will reconvene at 1:30.  I

24 apologize for the -- and I hope we're not on fire.

25          Stand in recess.

1    (Recess taken at 11:59 a.m.)

2    (Proceedings resumed at 1:38 p.m.)

3    (Call to order of the Court)

4    THE COURT:  Please be seated. I'm glad to see

5    everyone seems to have survived.  My apologies, again, for

6    the interruption.

7    Mr. Hirsh, I think you were at the podium.

8    MR. HIRSH:  Yes, thank you, Your Honor.

9    First of all, I do want to correct the record.

10   Mr. Agay would be very upset if I didn't.

11   I mentioned before that it was a default under the

12   DIP if we commenced or challenged the prepetition liens.

13   That's not correct.  It's a post-petition issue, so I stand

14   corrected on that.

15   THE COURT:  Okay.

16   MR. HIRSH:  So, Your Honor, I think where we left

17   off I wanted to step back and give the court just a little

18   bit of a different picture, which I think is the correct

19   picture, but it's something different than what we were

20   necessarily collective discussing.

21   And, you know, the DIP lender stalking horse,

22   PBBH, here says, well, you know, this is just like any other

23   case.  Secured lender, credit bids, you know, loan to own,

24   what's the problem.

25   The problem is, factually, there are differences

1  here that make the case unique, so far.  And, in all

2  fairness, we just started our investigation.  And one of the

3  reasons we had to file the 2004 is because we couldn't get

4  complete cooperation from the parties and extremely truncated

5  process.

6          And, you know, the credit bid objection deadline,

7  as it stands now, is July 13th, which did agree to.

8  That's basically three weeks from now.  We have an

9  intervening July 4th period of time holiday, and so we are

10 extremely concerned in order to do our job here and to make

11 sure things are kosher, we really need the time.

12         And I'll go into the 2004 after -- I know we're

13 talking about the DIP, but I do think they're all

14 interrelated.

15         So, stepping back for a second, why is this

16 unique?  It's a unique situation and it's a different

17 situation.  So, PBBH or its affiliate and/or, and I keep

18 using that phrase because we're not a hundred percent sure

19 yet, okay, but it's that party, those parties.

20         They brought the debt a week before the filing.

21 It's clear that the stalking horse wants to own the company,

22 and there's nothing wrong with that.  But they are different

23 than a typical first lien lender.

24         Here, something that is unique is the prepetition

25 debt structure.  Parties all over the cap structure were

1  involved with the company -- again, not the same company, not

2  debtor -- prepetition in the sale process prior to filing.

3          For example, Jefferies was the debtors'

4  prepetition, prebankruptcy investment banker that was hired

5  to sell the company and do a marketing process.  Well,

6  Jefferies is in the first lien group.  They're also in the

7  second lien group. That makes it unique and that's one of the

8  issues in 2004 that we're attempting to look into, and we

9  will look into.

10          They were responsible for implementing the sale

11  process.  That sale process resulted prepetition with an

12  entity, PBBH affiliate, coming in through an exclusivity

13  agreement with the company to acquire the company outside of

14  bankruptcy, prebankruptcy.

15          Prior to -- and these are in our papers, and I

16  know I don't want to waste a lot of the court's time on the

17  timing -- but prior to the filing that entity decided to

18  change the purchase price and the deal terms and cut the

19  purchase price by $20 million dollars, which then caused the

20  company prepetition to terminate exclusivity, and then hire

21  Houlihan and commence this process in bankruptcy.

22          That is a unique situation.  And if you have a

23  first lien lender that's been involved with the case for a

24  long time and, you know, maybe one or two entities in that

25  first lien group been involved.  They've been the lender for

1  a long time and are knowledgeable about the business, and

2  then comes in and does what they're trying to do here.

3        Maybe there's nothing wrong with it, okay.  And I

4  don't want my comments on the record to say that we think

5  there's something wrong.  The whole point of this is, we

6  don't know yet.  And we believe, as a committee, we have a

7  right to investigate for the benefit of the estate and our

8  constituents.

9        And if, in fact, there is something wrong, it goes

10  to my next point.  And my next point is really what Your

11  Honor touched upon in more depth prior to lunch, which is a

12  credit bid issue.  There are few ways, I think, I could

13  suggest to Your Honor that we could deal with that.  And I

14  understand Mr. Agay's one of the ways Mr. Agay tried to deal

15  with it could make sense.

16        The problem here is that if you allow our

17  challenge period -- let me say it this way.

18        We would have two challenge periods, really, but

19  one is really paramount and important.  It's the credit bid

20  challenge and that's July 13th.  August 6th is the lien

21  challenge.  But the way this has been set up currently is

22  that the August 6th lien challenge really becomes moot if the

23  auction occurs, the stalking horse is entitled to credit bid

24  up to the full amount of its debt, which, frankly, we're not

25  a hundred percent sure what that is yet.

1          THE COURT:  Right.

2          MR. HIRSH:  Somewhere around a $140 million.

3          THE COURT:  Right, that's why I asked how this was

4    going to work.

5          MR. HIRSH:  Right.  And it's very difficult to

6    figure that out.  But, at that point, it's really too late.

7    You know, the auction will have occurred.  The sale process

8    will have occurred.  There will, hopefully, be other bidders.

9          But if the stalking horse is entitled and gets a

10   chance to bid the entire credit bid amount, probably that's

11   the end of the auction. And who knows what, you know, if -- I

12   mean the reality is that $140 million dollars is a lot of

13   money.

14         So, it takes the effect or it has the effect of

15   chilling the bid and the auction prior to the auction even

16   starting.  And, on top of it, kills really our lien challenge

17   on August 6th because the --

18         THE COURT:  At that point with the lien -- right.

19   So, that's why I'm trying to figure out exactly where you all

20   are headed.  Because if I play this string out then -- and,

21   again, Mr. Agay, I think, gave me three plausible scenarios.

22   But, let's assume that nobody shows.  Then all of this is

23   effectively moot, at least, in terms of the urgency of the

24   situation.  We can figure this out.

25         But let's assume that people show up.  You do have

1  competing bids.  I think your point is if they're allowed to

2  credit bid, and they can go up to a 140.  And maybe some of

3  other bidders stay in.  Again, I haven't been in an auction

4  for a long time, but I have some recollection of the

5  enthusiasm with which competing bidders would watch a credit

6  bidder bid house money, but that is the way it is.

7           And let's assume that it goes to a number, I think

8  you said $90 million dollars.  And Mr. Agay's client bids 91

9  of its credit and everyone else says, okay.  Thanks.  I'm

10  done.  I'm not going any further because of a sense of where

11  this is headed.

12           They all leave.  And we're still weeks away from a

13  closing which is now on August 30, an outside date.  And

14  then, at some point, the committee actually mounts the

15  challenge.  And, let's assume, succeeds or just mounts it.

16  With the pending challenge, I'm not sure how you close unless

17  there's an escrow of cash or something else to make sure that

18  the money that's offered -- and, again, we're talking about

19  the prepetition.  The DIP is a different animal.  And I'm

20  assuming that that's what we're talking about.

21           So, your point is the committee or the debtor or

22  the process is out of luck if the committee mounts that

23  challenge and the buyer says, you know something we're not

24  going to be in for this fight.  So, our offer is withdrawn

25  and presumably there's something either in the DIP, in the

1 | APA, or in all of these documents that would give them that
2 | right.  At that point, you would have to start the process
3 | all over again.  You have no funding.  You have no DIP and
4 | you're stuck.
5 |             MR. HIRSH:  Exactly right.
6 |             THE COURT:  Okay.
7 |             MR. HIRSH:  And that's one -- I mean that is our
8 | biggest concern.  And that's why, you know, we --
9 |             THE COURT:  So, then I start with the proposition
10 | that I think your instincts are right.  The operative
11 | consideration is really the July 13 date.  And in that way,
12 | this isn't very different from a typical sale where we need
13 | to sort out the credit bid question before you go to an
14 | auction.
15 |             And, again, I appreciate the creativity that tries
16 | to square that circle and avoid an emergency.  But in most of
17 | these cases, the buyer comes in and says, Judge, we need to
18 | get a sale in 35-days.  And the answer I've given, and I gave
19 | it to one of the guys who was the founder of Facebook, was
20 | you got -- his face when I said you have to -- it was
21 | Zuckerberg.  It was one of the other guys from the movie.
22 |             UNIDENTIFIED SPEAKER:  Eduardo Saverin.
23 |             THE COURT:  What?
24 |             UNIDENTIFIED SPEAKER:  Eduardo Saverin.
25 |             THE COURT:  Yeah. And I said you need to post

1  cash.  And the answer was well he's -- and I said he didn't

2  give that rich by giving it away.

3       (Laughter)

4            THE COURT:  So, you know, something has to happen.

5  That is a process we've dealt with before.

6            And, again, I'm trying to get my arms around the

7  alternative mechanic that you've got.  But, again, to me, if

8  you're articulating this concern about whether an auction is

9  going forward with real dollars or real value from each

10 participant then that question has to be addressed prior to

11 the auction.

12           MR. HIRSH:  Right.

13           THE COURT:  How do I deal with that?

14           MR. HIRSH:  Well, so we have a -- I have a few

15 scenarios that, you know, to try and help the court and try

16 and figure out what makes sense here.

17           But I think, you know, one of the scenarios is,

18 you know, we agree to that August 6th deadline for our

19 challenge period for the credit bid.  It's post, but that

20 stalking horse agrees now so the world knows to cap its bid,

21 cap its credit bid to a certain sum amount.  I'm not saying,

22 you know, we have to figure that out.  But, at least, then it

23 levels the playing field somewhat.  And it allows for the

24 process to be fair and to be real.  That's one scenario.

25           The other scenario is you push out the sale

1  process until what we had talked about before the July 30th

2  date which I know we have agreed at the bid procedures, but

3  the facts are a little different or the issues are a little

4  different at this point.  And, so that will past the August

5  6th challenge deadline.

6          The third scenario --

7          THE COURT:  Well, let me ask you a question

8  because that's -- and that's often the discussion is that the

9  committee stands up and see, we can go to an auction if you

10  want, but you shouldn't be allowed to credit bid unless we

11  know your money is green.  And we don't know that right yet

12  and it's still subject, so how we going to deal with this.

13          And, again, that's not a novel situation.  This

14  idea of bifurcating the challenges, et cetera, is a little

15  bit new on me and I'm trying to get my head around how it

16  works.

17          So, you've got a July 13 deadline to challenge the

18  credit bid right.

19          MR. HIRSH:  Correct.

20          THE COURT:  Can someone explain to me how that

21  works?  So, July 13th, Friday the 13th, you file a challenge

22  that says under Fisker, it will chill or whatever.  This is

23  what we found out and we don't want them to be able to bid.

24          The auction is Monday?

25          MR. HIRSH:  Yes, Your Honor.  No, it's Wednesday.

1          THE COURT:  Right.

2          MR. HIRSH:  So, it gives you --

3          THE COURT:  Okay.  So, your bid deadline is

4  Monday, right.

5          MR. HIRSH:  Yeah, we probably be right here Monday

6  morning.

7          THE COURT:  Super.

8      (Laughter)

9          THE COURT:  But how does that work?

10         You know I've asked this question a thousand times

11  and it very rarely happens, but it is a -- you know, I don't.

12         And, there's a -- I will confess to you that part

13  of my instinct here is to say, it almost never happens, so

14  I'm going to put you in that jam or I'll put him in that jam.

15  But I'm trying to grasp how this proceeds forward.

16         And I will tell you this, this is postured as a

17  sale case on a particular timeline.  You have the right to

18  demand or suggest or request a different timeline, et cetera,

19  but I am trying to fit this into a scenario that is familiar

20  to me and workable.  And that's what I'm struggling with.

21         MR. HIRSH:  Yeah.  No, Your Honor, I appreciate

22  that.

23         I mean, I think, frankly, we have until the 13th.

24  And, again, it goes back towards why we really need the 2004

25  --

1            THE COURT:  It's a different question.  But --

2            MR. HIRSH:  It is.

3            THE COURT:  -- and you'll get what you need.

4            MR. HIRSH:  Well, I appreciate that, Your Honor. I

5   think, but --

6            THE COURT:  But it's the same problem in every

7   case, though, you know.

8            This is actually not even -- let's assume that we

9   don't have this oddball dynamic where there's going to be a

10  sale hearing and a pre-challenge conclusion and a closing

11  after.  Okay.  Again, I think, that's perhaps an elegant way

12  to try to deal with that.  But put me in my normal fact

13  pattern.

14           Mr. Hirsh, your period expires on the 13th and the

15  parties have agreed on an auction on the 18th because that's

16  the way it works.  If you don't challenge, then Mr. Agay has

17  got good money.  If you do challenge them, we got a problem.

18           MR. HIRSH:  Right.

19           THE COURT:  Right?

20           MR. HIRSH:  Right.

21           THE COURT:  And, again, you're here on Monday

22  morning saying I need a hearing on the merits of his claims

23  or on a <u>Fisker</u> hearing or -- and, you know, I can imagine

24  what that hearing would be, but that gets very difficult to

25  conclude that --

1           MR. HIRSH:  It does, Your Honor.

2           THE COURT:  -- prior to an auction.

3           MR. HIRSH:  It does, Your Honor.

4           You know, I don't have an exact answer for you as

5    to the process.  I really don't.  I think if we believe we

6    have a good faith challenge to limit the credit bid, we would

7    have to file an emergency motion to do so.  And I think then

8    we would probably ask Your Honor -- and, again --

9           THE COURT:  To bounce the hearing.

10          MR. HIRSH:  -- to just, you know, a short period

11   of time.  And we both understand the situation with -- the

12   financial situation of the company.

13          THE COURT:  Sure.

14          MR. HIRSH:  And we also would have to balance all

15   that.  But you raise a very, you know, important and,

16   obviously, very practical point.

17          THE COURT:  Well and I want to be clear just so

18   that nobody misreads, at least, where I am.  I mean part of

19   this is just a practical and curious question.

20          But, second, while it may seem like I'm jumping on

21   you, I mean a lot of this is actually I'm jumping either on

22   the debtor or the buyer because the situation that you've

23   just described of, you know, a challenge deadline right

24   before an auction is actually not a novel proposition.

25          Experience teaches that we blessedly avoid that

1  much of the time.  But I actually will confess with recent

2  month in the M&G case, we had precisely that.  And we had a

3  full-blown trial scheduled for two days a week before the

4  auction or a week before the sale hearing.  And it gets

5  settled.

6         But they were ready for the trial and then they

7  reached an agreement that they would adjourn the lien

8  challenge trial to the 9:00 a.m. time that I had for the sale

9  hearing, which didn't make a lot of sense to me, but they

10  knew what they were doing.

11         So, I will say this.  While I'm kind of

12  editorializing about whether or not a lien challenge --

13  that's what I'm saying.  Right.  This is a challenge and it's

14  on the 13th.  And this stuff in August does not seem to me to

15  be terribly functional in terms of what I need to deal with

16  in the context of a sale.

17         It may be that it does effectively reserve your

18  rights and allow us to deal with things on the backend.  And,

19  again, I'm not going to criticize anybody for creative on one

20  side or the other to try to avoid an issue, but here's what I

21  see.

22         I see a sale that wants to go to an auction before

23  a challenge period using money that remains subject to a

24  credit bid.  And you've pointed out some facts that are

25  different, all right, and they are.  Okay.  You know, the

1  immediate acquisition beforehand.  All of those, you know,

2  whether we call it smoke or issues, et cetera, but it's all

3  been disclosed.  I know what our fact pattern is.

4          Whether you can make anything with that or whether

5  or not that remains to be seen, that's the subject of the

6  2004.  But I look at it as July 13th.  I think that's the

7  operative issue, at least structurally.  Am I mistaken?

8          MR. HIRSH:  No, I agree with you a hundred

9  percent.  I mean that's why we were trying to figure out if

10  there was a way to extend it or to do something, but I don't

11  - you know, obviously absent agreement.

12          The other issue here is -- that's the issue on

13  that.  I mean I can leave it at that and I can discuss the

14  other points relating to the DIP.

15          THE COURT:  Let's talk a little bit about the DIP.

16          MR. HIRSH:  Sure.  Well, first and foremost, and

17  just to point out to the court, the maturity of the DIP is

18  August 30/31st, the end of August.  That's fine.  But I can't

19  imagine the sale will close by then.

20          So, it's difficult, I think, to approve a DIP on a

21  final basis that matures before a sale is going to close

22  based on the regulatory issues.  That's literally only five

23  to six weeks after the sale hearing.  That's an issue,

24  obviously, for us because then if the DIP matures, there's no

25  -- it dovetails into, frankly, the other issue which is the

1  wind down of this estate.

2          We see a DIP here that is, you know -- again, they

3  need the DIP.  That's not the issue -- the issues that we

4  have with it.  But for it --

5          THE COURT:  Well is there an expectation that I

6  would approve a 506(c) waiver in the absence of some

7  understanding of a wind down?

8          MR. HIRSH:  No, I didn't think there would be.

9          THE COURT:  Okay.  Let's move on.

10         MR. HIRSH:  Okay.  Thank you.

11         So, Your Honor, well that's a big part of what we

12 had issues with.

13         And, Your Honor, just going through our objection.

14 It's typical in a lot of cases that the buyer acquires

15 Chapter 5 or preference actions and things like that.  And,

16 you know, absent agreement, at this point, we don't believe

17 it should be part of the DIP.  It should be carved out for

18 the sale.  And the Chapter 5 should stay with the estate.

19 There certainly shouldn't be any liens or superpriority

20 claims granted to the DIP lender on those.

21         Inclusive of the Chapter 5, we don't think

22 commercial tort claims should be included as well.  We have

23 no reason to -- again, one of the issues the committee is

24 looking at we don't have any reason to believe at this point

25 that there's any wrongdoing or anything.  But the D&O claims

1   should be left with the estate as a potential way to recover

2   for unsecured creditors.

3           Your Honor, the budget professional fee issue I

4   actually hate talking about this and I'm just going just say

5   that we just don't think it's fair, this disparate treatment

6   between the professionals, just based on the numbers.  We had

7   flooded, you know, what we believe was a fair number to put

8   us in as the budget.  And I'm saying us is committee

9   professionals, not just counsel, but that was rejected.

10          I don't know if you want me to pause or not.

11          But 552, again, we don't think that should be

12  approved on a final basis at this point.  We don't, frankly,

13  know, you know, from everything we discussed already today,

14  we don't really understand or know what's going to happen in

15  this case.  We don't know there's a wind down budget.  We

16  don't know the outcome of the auction to credit bid and we

17  don't think it's proper to have that in this order.

18          The other thing here, Your Honor, are standard

19  typical.  The 364(e), though, I think should be limited

20  because, again, talking about the challenge, commencing a

21  potential challenge credit bid/lien, we don't think it should

22  apply in the final.

23          THE COURT:  Well 364(e), your point is it

24  shouldn't apply to any funds or monies other than those

25  advanced under the DIP?

1        MR. HIRSH:  Yes, Your Honor.

2        THE COURT:  I understand.

3        MR. HIRSH:  And then, Your Honor, marshalling as

4  well, in this case, we don't think is appropriate in light of

5  the same issues.

6        But, Your Honor, those are the main issues that we

7  see.  Unless Your Honor has any specific questions?

8        THE COURT:  No, I don't think I have any questions

9  right now, obviously.

10        I want to confirm, at least, one point because we

11  focused specifically on the committee's objection.  I believe

12  there are a couple of other objections or responses that are

13  included.

14        I will tell you that my instinct is I don't

15  believe that testimony is necessary.  I know that the debtor

16  has its personnel here.  But I just want -- I see these as

17  deal issues that are pretty straightforward and, again, not

18  necessarily susceptible to an evidentiary record.

19        So, I just want to make sure everybody's prepared

20  to proceed.  If somebody wants to insist on examining a

21  witness on some of these points, then this would be that

22  opportunity; otherwise, we're going to deal with this as we

23  typically do.

24        MR. HIRSH:  Yeah, Your Honor, that's fine.

25        The other thing I did want to point out, Your

1  Honor I think mentioned, not in this case, another case, but

2  I do think the fees should be reduced.

3          Here, the DIP lender is looking for 1.5 percent

4  commitment fee, and I understand a commitment fee is

5  appropriate.  I'm not saying they shouldn't get a fee.  But

6  then there's an unused line item fee of half a point which,

7  frankly, based on the facts and who the parties are in this

8  case, we just don't think is appropriate.

9          THE COURT:  Okay.  I understand.

10          MR. HIRSH:  Thank you.

11          THE COURT:  This is turning into a conversation,

12  but it's not one that any of you haven't had before.  So, Mr.

13  Johnson, you get a chance and I'll hear from Mr. Agay as

14  well.

15          MR. JOHNSON:  Thank you, Your Honor.

16          I'll let Mr. Agay deal with the credit bid issues

17  and sort of the first part of the conversation, I think,

18  we've talked about it.  And I think a lot of that depends on

19  what his client is willing to do --

20          THE COURT:  Yeah, I think I understand the credit

21  bid concerns and I'll, at least, ask the party.  I have some

22  thoughts on that, but I would share with the parties and

23  maybe we can sort of land.  Because, again, I'm not certain

24  that there's necessarily a violent disagreement between he

25  parties.  We need to proceed forward with some steps in

1 prospect.  And I believe there are ways that that can be

2 accomplished.  But, again, you know, the ins and outs of the

3 transaction and the case better than I do, but I'll at least

4 try to share some thoughts on that.

5 　　　　　　And, again, I will say this as well, I do take,

6 frankly, some comfort from Mr. Agay's comments.  Yes, as a

7 practical matter could somebody set this up and call ticky

8 tack defaults or something else?  Yes.  But, again, you'd

9 wind up in front of me pretty quickly.

10 　　　　　　And, second, I have no reason to believe that they

11 don't really want to buy this business.  And I don't think

12 the committee has really challenged that proposition either.

13 So, you know, on that mechanic while we could get bogged down

14 in the well what happens if you chose to do something, you

15 know, clever or counterintuitive.  I'm not necessarily going

16 to get too deeply into that.

17 　　　　　　I'm going to proceed on the assumption that

18 somebody that has made, taken the steps that this purchaser

19 has, that have been disclosed to the court and made the offer

20 that its made on a sale process that's already been

21 structured before the court intends to move forward and will

22 do so and service a DIP lender consistent with that ultimate

23 goal.  So, we'll start with that.

24 　　　　　　MR. JOHNSON:  Thank you, Your Honor.

25 　　　　　　Yes, I think that goes to a lot of the points that

1  we were making earlier.  I think, you know, even if there

2  were some sort of issue and, again, I'll leave those issues

3  with Mr. Agay because it primarily involves his client's

4  concerns.  But, at the end of the day, it's Mr. Agay's

5  interest to preserve the estate and the value of the assets

6  they want to purchase.

7        You know, even if they were to blow up the sale or

8  something along those lines, that hurts them, because they're

9  the secured lender.  They're the only person who is going to

10 see some sort of significant recovery.  You know and if they

11 decide to ruin the process, so it's not in their interest,

12 Your Honor.

13       I think that they're supportive of one of the

14 process and even if their credit bid gets changed, I think,

15 at the end of the day, they're left with very few options.  I

16 mean a conversion or a dismissal here doesn't really work for

17 anybody.  So, I think we keep that in mind, Your Honor.

18       With respect to the particular, I guess, sort of

19 the list of objections.  Your Honor, the EPA provides that

20 the buyer commits to fund a wind down budget.  Now, that's a

21 closing condition in the APA.  So, if we can't come to a

22 reasonable agreement with the purchaser then the purchaser

23 can't close on their assets.

24       So, we don't know what the wind down budget looks

25 like.  It's impossible for us to say at this juncture exactly

1   what it would look like and I know everybody has asked for

2   it, and we put some thought into it, but we simply don't know

3   what will happen post-sale.  And there will be some sort of

4   transition.

5          There could, for all we know, Your Honor, we could

6   enter into some sort of transition services agreement

7   immediately after the sale and most of the professionals on

8   the debtors' side will just be watching.  You know, Mr.

9   Agay's client or whoever the purchaser is operate the

10  facility and monitoring it and it may substantially reduce

11  the office fees and expenses that come out of the DIP.

12         So, we just don't really know -- I'm sorry -- at

13  the very end of the DIP.  So, we just don't really know when

14  that will happen, Your Honor, or what will happen.  But there

15  is a commitment to fund the wind down budget.  And the remedy

16  for the estate is a refusal to close, absent a commitment on

17  the reasonable wind down budget.

18         So, I think that sort of obviates, at least, some

19  of these issues, Your Honor, because there is that commitment

20  to do something here.

21         And, Your Honor, in terms of the Chapter 5 and the

22  commercial tort claims, this is the bargain, Your Honor.

23  This is the bargain we struck with our DIP lender.  You know,

24  it's critical to have this cash.  There's nobody else in line

25  to provide this cash.

1          So, at the end of the day, you know, we ended up -

2  - they asked for liens on the avoidance actions and the

3  commercial tort claims.  And to the extent those are

4  unencumbered assets, Your Honor, the debtor agreed to do so

5  in its business judgment and believed that was the most

6  appropriate use.

7          And we understand that the committee would like to

8  have some unencumbered assets to use in some other fashion,

9  but there aren't a lot of assets here, Your Honor.  This is

10  specifically underwater case.

11          Your Honor, in terms of the fee numbers, as I

12  indicated earlier, the DIP lender and the estate unilaterally

13  increased the number from $210,000 for committee

14  professionals to $410,000 for committee professionals.

15          Your Honor, we do recognize that there's a role

16  for the committee and the committee, of course, has to

17  discharge its statutory duties.  In a sale case like this,

18  Your Honor, there are statutory duties largely involved this

19  investigation and regarding the credit bid and the lines.

20  And we think this is a reasonable number.

21          Part of the reason for the disparity between the

22  debtor professionals and the committee professionals is

23  simply the heavy lifting associated with the closing and the

24  transferring of the assets to the purchaser.  Again, it's not

25  something we've just signed over a deed and they run the

1  situation.  We have to go through regulatory processes and we

2  have to be involved.  So, there's a lot of post-sale heavy

3  lifting by the estate professionals that will still have to

4  be done prior to the close, post-sale approval and prior to

5  the close.

6         So, it's one of the reasons there's disparity

7  there, but we think the $400,000 is reasonable to fund the

8  investigation.  And, again, Your Honor, we agreed to increase

9  the cap on the investigation related fees from 25 to $100,000

10 which was the request and the objection.

11        Your Honor, with respect to the 364(e) finding,

12 Your Honor, that finding is limited to the DIP lender only,

13 what the DIP lender had.  That does not apply to the

14 prepetition lender.  So, we agree with that.

15        But, Your Honor, on the marshalling and the 552

16 issues, you know, the DIP lender has agreed to a carve-out.

17 They've agreed to a carve-out for professionals and we all

18 will get some sort of carve-out, whatever is ultimately

19 approved by the budget.  And, again, Your Honor, it's the

20 deal that we negotiated.  It's within the debtors' business

21 judgment that this is the best available terms for the

22 financing.

23        So, we appreciate the committee's efforts to

24 improve those terms for the estate, but, Your Honor, at the

25 end of the day, this is the deal that we're left with and we

1   think it's a reasonable one, Your Honor.

2           And, finally, Your Honor, with respect to the fees

3   needing to be reduced, Your Honor, this isn't a case where

4   the DIP lender is trying to make money as a DIP lender.  The

5   DIP lender is not getting a breakup fee.  The original ask

6   for the commitment fee was three percent which the DIP lender

7   agreed to reduce to 1.5 percent to make it more in line with

8   market.  The unused line fee of a half a percent is very

9   common, we think in these deals, Your Honor.

10          We think that it's reasonable in light of the

11  commitment.  It's a $15 million-dollar commitment to fund a

12  three-month case.  So, we think that, you know, there are

13  fees here, Your Honor.  But, at the end of the day, they're

14  not a dramatic -- they don't have a dramatic impact on the

15  cash flow, so we don't it's -- we think it's fairly

16  reasonable.

17          THE COURT:  Okay.  Here's what I'd like to do

18  before I hear from anyone else.  I'd, at least, like to share

19  some observations.

20          First, with respect to the mechanics of the

21  process, again, it seems to me that I'm not going to recite

22  my comments, but I have a full expectation consistent with

23  counsel's comments that the DIP lender/prepetition secured

24  creditor/stalking horse is interested in acquiring the

25  business.  And that, you know, it is funding this process.

1  That's not a remarkable proposition, and I'm not -- I don't

2  think the committee is arguing that financing is necessary

3  here.

4       I would observe that -- and, again, we can walk

5  through on a line by line basis, but, as a general

6  proposition, to the extent that remedies -- that defaults are

7  called and remedies are sought to be exercised, I believe it

8  is appropriate that there's an opportunity, whether it's

9  three days or five days to get into court, and the court will

10  conduct the hearing.

11       That hearing is not limited to whether or not

12  there's been a trip of romanette seven of the DIP.  I'm going

13  to conduct a hearing. And I don't think that's inconsistent

14  with Mr. Agay's expectations or, frankly, the committees

15  either.

16       And experience also teaches that that is probably

17  and, hopefully, not likely to happen again, because that's

18  usually for what I would call it a ticky tack default or

19  where circumstances change so dramatically that a DIP lender

20  chooses simply to take over.

21       Given that the number of hats that the lender is

22  wearing, it seems to me, at least, in my experience, that's

23  less than likely.  But the committee's concern is, I think,

24  is founded upon, at least, the options and the prospects that

25  are built into the order.  And it seems to me that rather

1  than go through them and impair the rights of somebody that

2  is lending and supporting this process, I think the release

3  valve is to provide that there is an opportunity to get into

4  court very, very quickly to address any of these issues.

5          And, again, knock on wood, experience teaches that

6  that usually doesn't happen and we are, again, a total of

7  about three and a half weeks away from the proposed sale

8  hearing, right.  So, I'm not, at least, at this point, giving

9  specific comments or changes with respect to the EODs and the

10 termination events.  I understand the process that we're in.

11         With respect to the long colloquy that we had on

12 what to do about the credit bid, I think I'm going to do very

13 little with that.  The committee has a functional deadline,

14 as I see it, of the 13th of July.  And if something comes up

15 and I need to deal with it, I will deal with it.

16         It may be that it is the sort of thing that can be

17 dealt with the day before the sale hearing or the day before

18 an auction.  And it may be something where the committee will

19 come in and say we need another two weeks to brief this issue

20 because their money is not good.

21         And I think that the process requires it.  I think

22 the committee is entitled to it and, most importantly, I

23 think the potential competing bidders are entitled to

24 confidence in the sale process and the currency the parties

25 are bringing to the table.

1        So, I see the mechanic of July 13th as being not

2   inconsistent with what I've seen and approved before, as a

3   practical matter.  But consistent with my comments a moment

4   ago, I don't know how it plays out from there.  It's

5   structurally very difficult and I don't think Mr. Hirsh tried

6   to duck the question either.

7        I mean if they come in, we have a problem.  And,

8   again, we'll get it sorted out. And, if not, then fine.  I

9   cannot recall a situation where I've granted a Section 506(c)

10  waiver over a creditors committee's objection.  I cannot

11  imagine or expect that I would grant that waiver today for a

12  DIP lender in the context of a sale case that has a prospect

13  of a wind down budget and a structure.  But that's all it is.

14       And I understand the deal terms and the deal

15  realities that require that you can't figure out what the

16  wind down budget is or the wind down process because you

17  don't know how the winner is and you don't know what was

18  bought and you don't know how long it will take.  But the

19  fact of the matter is that consistent with the comments that

20  I made at the beginning of this case, it's, you know, I need

21  to understand where you're going.  I'm not a foreclosure

22  court.  And, so to me that seems unlikely.

23       The grant of liens on avoidance actions and on the

24  commercial tort claims, likewise.  I don't recall where I

25  have granted that relief to a DIP lender over a committee

1  objection.  And that seems to me where we're mixing up the

2  hats.

3          The DIP lender is not necessarily entitled to

4  that.  A buyer is certainly entitled to purchase them for

5  very very practical and rational and reasonable business

6  reasons.  I don't want a committee suing all of my customers

7  or my vendors.  I do that all the time.  I don't know whether

8  that's built into the transaction right now, but, again, I

9  would not grant that lien on the avoidance actions right now

10  because I think that that actually combines the process of

11  the lender versus the buyer.

12          With respect to the inequity between the parties,

13  as I've said before I generally do not get into the budget

14  line item and the fighting.  But I will acknowledge, Mr.

15  Johnson, that you're right, and I will make this observation

16  to Mr. Hirsh.

17          The court reserves to itself the right to allocate

18  funds within a budget that are allocated to professionals.

19  I'm not trying to put anybody, you know, out on a limb or

20  anything else.  It is clear to me the economics of this case

21  are not attractive for the creditors committee.  And those

22  are facts that are just brought to me.  All right.

23          Mr. Hirsh didn't make these facts.  I didn't make

24  these facts.  You didn't make these facts.  We are where we

25  are.  So, I am aware of the challenges that the committee

1 faces in trying to identify or obtain value, and I make no

2 comment on whether or not there's a prospect.

3          There are cases that simply do not present that

4 value.  And consistent with your comments, Mr. Johnson, you

5 said the committee needs to do its fiduciary -- and I see

6 most of that effort being attended to testing the legitimacy

7 of the bid and encouraging and clamoring competitive bidding

8 that might get up a mountain and put unsecured creditors into

9 the money.

10          But it does seem to me that there is a -- I don't

11 disagree, I guess, is the easiest way.  I don't disagree with

12 your characterization of what the expectations would be for

13 the professionals.  And, frankly, that if this goes to a

14 sale, either to Mr. Agay's client or to somebody else, there

15 is some heavy lifting that's got to be done.  It's a

16 regulated business. We've sold these things before.  It is

17 not simple.  And, again, most of that I would expect would

18 fall on the shoulders of debtors' counsel.

19          So, I wouldn't necessarily go into this by any

20 stretch expecting that the court would juggle those numbers

21 to see a 50/50 or anything else just because that's not how

22 it would work.

23          But I'm also not going to dictate because I don't

24 know and I lack the context and the information to say, you

25 know something the right number for the committee is $555,000

1  dollars.  I just don't know.  And if we have to have that

2  fight at a later point, I will have facts within which to

3  make that determination of what is fair and appropriate.

4         As far as the DIP fees go, I understand the

5  committee's concerns about the fees, although I view them as

6  largely market.  And I probably -- I'm not inclined to get

7  deeply involved into that discussion.

8         With respect to marshalling and 552(b), I make no

9  comment at this point.  I've dealt with those issues.  I

10 understand the lender's concern about its exposure.  Much of

11 the complexity of dealing with these questions is because the

12 lender is also the buyer and the DIP is part of the currency.

13 I understand all of that.

14        I think the 364(e) issue has been resolved because

15 it is the DIP.  And DIP money is good money and you get your

16 finding on that and you can bid that.  I don't see any issue

17 with that.

18        Likewise, to me, anyway unless there were

19 circumstances that would come up at the sale hearing that

20 would require alternative relief, I don't see why a DIP

21 lender wouldn't get paid out of the proceeds upon receipt.

22 And, again, that's the benefit of the hats that you're

23 wearing.

24        And then I think that covers a lot of the points

25 that the parties have made.  I'm hopeful that with at least

1 some of those comments the parties can, at least, try to come

2 up with a path forward.  I know we're left a lot of play in

3 the joints, but actually I'll tell you that that's

4 intentional because you got a sale process.  You have an

5 investigation.

6           And if there are buyers or other people that are

7 out there, great.  And, if not, again, if the core of the

8 process here is a business with employees and customers and

9 patients.  And I think it is the intention and expectation of

10 everybody that that business will be held together, funded

11 and preserved, pending a sale, that allows the maximization

12 of value.

13           But what I'd like to do is before I hear from

14 anybody else, I'd like to take just a short break, say

15 fifteen minutes and then we'll reconvene and figure out a

16 path forward.

17           Mr. Agay.

18           MR. AGAY:  Your Honor, can I ask a couple of

19 questions?

20           THE COURT:  Yeah, sure.

21           MR. AGAY:  I'm not going to argue.  I just want to

22 ask a question.

23           THE COURT:  Right.  And I haven't actually ruled.

24      (Laughter)

25           THE COURT:  As long as we're on the same page.

1          MR. AGAY:  Yes, no I get it.  I want to make sure

2   I understand Your Honor's guidance.

3          THE COURT:  Sure.

4          MR. AGAY:  David Agay, again, on behalf of the

5   stalking horse and DIP lender.

6          In terms of the 506(c) argument based on Your

7   Honor's comments I take it that once we do agree on a wind

8   down budget that Your Honor would view a 506(c)waiver

9   appropriate at that time?

10         MR. AGAY:  I'd be a good deal more comfortable

11  with it, again, because I'm just trying to figure out the

12  path forward.

13         MR. AGAY:  Understood, understood.

14         Going back to the credit bid issue, assuming we

15  keep the July 13th date and let's further assume that they

16  would not convince Your Honor that there's cause to cap our

17  credit bid, at that point we go to an auction and then you go

18  to their lien challenge.  They will still have an

19  opportunity, I believe, at that point, to challenge our liens

20  and still go after our credit bid, if our credit bid

21  survives, right?

22         THE COURT:  Yeah, I don't understand how that

23  works.  And I may be -- it's the afternoon.  I may be a

24  little dense.

25         MR. AGAY:  So, but here's what I'm getting to and

1  I don't have any authority from my client.  But if we just

2  agree to cap our credit bid today at some amount that makes

3  Your Honor comfortable doesn't this issue just go away?

4           THE COURT:  That's a great discussion for you to

5  have with Mr. Hirsh.

6           MR. AGAY:  Okay.

7           THE COURT:  No, and I'm not being cute.

8           MR. AGAY:  No, no.

9           THE COURT:  There are more moving parts to this.

10          MR. AGAY:  Right.

11          THE COURT:  And I don't necessarily want to tip

12  that discussion because you got a lot of things to talk

13  about.

14          I want to be clear, though, and I think I was

15  clear at the beginning.  This is postured as a sale case,

16  presented with the stalking horse.  The issues about, you

17  know, the number of hats your client has is out there, but

18  it's been fully disclosed.  Ang, again, not novel, not ideal,

19  you know.  You have issues you need to deal with and you're

20  dealing with them straight up.

21          But, again, I see this as a process and a process.

22  And, again, the court has entered a bid procedures order that

23  sets the dates, et cetera.  And while I think as a notional

24  concept, Mr. Hirsh was talking about we may need to move the

25  dates out or something else.  I'm not there yet.

1    Here's where I am.  If you can deal with the two-

2  piece thing so then structurally the 13th is like a Fisker

3  question, right.  It's do we cap it or not?  And, remember,

4  Fisker proceeded on stipulated facts.

5    MR. AGAY:  I recall that.

6    THE COURT:  Yeah.  And Judge Gross was deeply

7  aggrieved by all the ABI conferences that misconstrued his

8  opinion, nevertheless.  The thrust of Fisker was don't tick

9  off Judge Gross.

10    MR. AGAY:  Right.

11    (Laughter)

12    MR. AGAY:  I will think it's very difficult to

13  tick off Judge Gross.

14    THE COURT:  You know --

15    MR. AGAY:   For the record.

16    THE COURT:  You don't talk to him off the bench.

17  He seems nice, but I digress.

18    MR. AGAY:  I say the same about Your Honor also.

19    THE COURT:  There you go.  Your instincts are

20  excellent.

21    MR. AGAY:  Yeah.

22    THE COURT:  So, anyway, I see that as a Fisker

23  thing and I'm not sure what that hearing looks like.

24    What I was saying with Mr. Hirsh was almost

25  intuitively my thought is that it's -- Mr. Hirsh said August

1  6th is kind of moot.  I think it is the challenge and the

2  capping.  And it may be that you propose the cap idea on the

3  13th as a way to resolve it.  I don't see where that helps

4  Mr. Hirsh.

5         And, again, I'm kind of editorializing here.  But

6  I actually think the structure that's been proposed -- and I

7  really could be wrong.  And if I'm wrong, then I would

8  welcome being corrected.  But it seems to me that the

9  structure that you proposed with the July1 13 and August 16th

10  actually creates uncertainty on both sides and there may be

11  value in uncertainty.  But it actually creates -- because I

12  don't know what happens then on the 6th if he challenges and

13  succeeds and I don't know what happens on the 13th when you

14  sit down and say, I'm capped or I'm not capped or I'm capped

15  with money that may not be real.  That's part of the --

16         MR. AGAY:  Right, no I understand what Your Honor

17  is saying.  I think it can work, but it's neither here nor

18  there.

19         But the purpose of July 13th --

20         THE COURT:  I'll let you do it.

21         MR. AGAY:  -- is 363(k).

22         THE COURT:  Right.

23         MR. AGAY:  And if we remove the 363(k) question

24  today --

25         THE COURT:  Right.  But my point would be this.

1  Look if you do, God bless you.  All right, I got no problem

2  with that.  If you reach a deal on that mechanic, I will

3  leave that to you. It's your money. It's your transaction,

4  and I respect -- you know, all kidding aside, I respect your

5  judgment about what your client's best interest are.  You

6  have immensely more information on this than I do.

7           But, again, trying -- if that resolves itself,

8  terrific. But if, for example, Mr. Hirsh objects on the 13th

9  and says the credit bid should be limited to $80 million

10  dollars, plus the DIP, all right, whatever.  Because the DIP,

11  again, I'm assuming is good money so let's just talk about

12  the prepetition credit bid.

13           So, the 363(k) is you can credit bid that.  And

14  then on the 6th he says, you know something, and I know this

15  didn't happen, why didn't you file any UCC1's?

16           MR. AGAY:  That would be unfortunate.

17           THE COURT:  It would be sad.

18           MR. AGAY:  Yeah.

19           THE COURT:  I'd be mad that he hadn't found it out

20  beforehand, but --

21           MR. AGAY:  It wouldn't be my law firm for the

22  record, Your Honor.

23           THE COURT:  Right.  You want that on the

24  transcript.

25           MR. AGAY:  Yeah.

1          THE COURT:  So that's the point I don't understand

2    is exactly what happens with that.  I mean if Mr. Hirsh -- so

3    that's why I think it creates this weird uncertainty.  If he

4    says, you know something, I'm not going to argue about $60

5    million dollars of your liens.  I will acknowledge and I will

6    waive the challenge as to the first $60 million dollars.

7    Then, again, you know he knows and other bidders know about

8    the dollars that are being bid.

9          And, again, I'm not really ruling.  I'm trying to

10   figure out where it is you guys are going with this.  If you

11   can resolve it in the path that you're describing, great.

12   But, to me, I think that -- and I'm not trying to jam the

13   committee, but I think that that question of what somebody is

14   going to bid has to get answered.

15         MR. AGAY:  No, I understand that.  I'm just trying

16   to simplify the process and you want to spend their money on

17   the business, not on the bankruptcy court process and the

18   litigation.

19         THE COURT:  Not on this.

20         MR. AGAY:  And we'll have the discussion out in

21   the hall.  The point I'm driving out is I would hate for this

22   -- if we're willing to resolve this credit bid issue today in

23   a constructive way as we've been talking about, I would hate

24   for that to stay alive merely to give the committee something

25   to argue about and throw the process in a disarray later on.

1        THE COURT:  I understand the point.  I'll give the

2  parties an opportunity to confer on it, and, again, I'll look

3  for guidance.

4        The 2004 issue, we'll deal with later.  But,

5  again, just to be clear I don't think anybody should be under

6  any illusions.  This is a path we've traveled before.  The

7  committee has to do its investigation.  Parties are going to

8  need to coordinate and I've read both of the supplemental

9  responses or the preliminary and then the supplemental which

10  I think they're six hours apart.

11        But, you know, again, it's going to be expedited.

12  These questions have to be answered.  And, again, some of the

13  2004 timing issues may be answered by the distinction between

14  again the July 13th and August 6.  I leave that to the

15  parties.

16        So, why don't we take what will certainly be more

17  than 15 minutes, but we'll start with 15 minutes before you

18  ask me for a further extension.

19        Stand in recess.

20     (Recess at 2:27 p.m.)

21     (Proceedings resume at 3:46 p.m.)

22     (Call to order of the court)

23        THE COURT:  Mr. Agay.

24        MR. AGAY:  Good afternoon, Your Honor, David Agay

25  for the stalking horse and DIP lender, again.  I'm taking the

1  lead only because we've had some conversations out in the

2  hallway and I can bring Your Honor up to speed on where we're

3  at.

4            THE COURT:  Sure.

5            MR. AGAY:  In short, I don't believe July 13th is

6  any longer a relevant date because we are agreeing to cap our

7  credit bid for purposes of the auction.  It's $65 million

8  dollars.

9            THE COURT:  Okay.

10            MR. AGAY:  So, which is --

11            THE COURT:  Does that include your DIP?

12            MR. AGAY:  Yes.

13            THE COURT:  Okay.

14            MR. AGAY:  Yeah, so it's just as -- our initial

15  offer is 65 and we believe that that is the purchase price of

16  our debt plus the DIP.  So, we're effectively agreeing to

17  Fisker ourselves.

18            THE COURT:  Okay.  Better that I don't have to

19  write it.

20       (Laughter)

21            MR. AGAY:  Yeah.  So, that results in the July

22  13th objection deadline going away, the 363(k) issue going

23  away.  Provided that any sale order entered in the case is

24  going to provide that we pay a closing or any other party

25  pays a closing goes to repay our debt, our first lien debt,

1 | subject to their challenge rights.

2 |          THE COURT:  Okay.  I understand that.

3 |          MR. AGAY:  Okay.  In terms of the 2004 motion, we

4 | have agreed to do a meet and confer at 2:00 p.m. Eastern,

5 | subject to everybody's schedules.

6 |          THE COURT:  Sure.

7 |          MR. AGAY:  And there's going to be four topics of

8 | discovery.  And I'm putting this all on the record because --

9 |          THE COURT:  That's fine.

10 |          MR. AGAY:  The first area is going to be the

11 | purchase of the first lien debt by my client and the members

12 | in my client.  I mean the joint venture participants.

13 |          THE COURT:  Sure.

14 |          MR. AGAY:  The second area of inquiry is going to

15 | be around the offer that was made prior to the bankruptcy

16 | case that resulted in exclusivity being given to a

17 | predecessor, I'm told, of my client for a period of time to

18 | ultimately consummate a transaction.

19 |          The third area of inquiry is going to be a

20 | purchase price adjustment that was made during that period.

21 | And that I'm told was made during that period.

22 |          And the fourth area of inquiry is going to be the

23 | termination of that exclusivity period.

24 |          THE COURT:  Okay.

25 |          MR. AGAY:  Okay.  And during the meet and confer

1  tomorrow, we're going to agree on search terms and custodians

2  and we'll agree on a production deadline of July 10th.

3          THE COURT:  Okay.

4          MR. AGAY:  Which is consistent with what I

5  understand has been agreed to informally with the debtor.

6          In terms of 506(c), Your Honor, we would agree to

7  entry of the final order with a 506(c) waiver subject to a

8  wind down budget that is included as part of the sale order.

9          THE COURT:  And I think currently the concept is

10  it would have to be.  The concern is that it's, at least,

11  presently notional.

12          MR. AGAY:  Yes.

13          THE COURT:  I understand.

14          MR. AGAY:  Okay.  The last item, Your Honor,

15  relates to the committee budget and we do not have agreement

16  on this.

17          I heard what Your Honor said, but I just ask that

18  Your Honor hears us out.

19          THE COURT:  Sure.

20          MR. AGAY:  We had all the estate professionals in

21  this case are subject to a line item in the budget for all

22  the obvious reasons.  We included an initial budget for the

23  committee.  We doubled that budget as part of our proposal.

24          We thought that was fair in light of the timeline

25  dynamics of this case.  Recently, before Judge Walrath, I was

1  representing the DIP lender, the staling horse and there was

2  a plus or minus of $450,000-dollar budget on a similar

3  timeframe that we had here.  I'm not saying it's binding on

4  your --

5            THE COURT:  No, I understand.

6            MR. AGAY:  We went back and forth out in the

7  hallway and they won't agree to a line item in the budget.

8  And, candidly, that's not fair, we believe.  We're being

9  asked to fund these cases.  They should have --

10           THE COURT:  Can I ask who is it not fair to?

11           MR. AGAY:  It's not fair to us as the lender

12 that's being asked to fund this case.  And it's not fair to

13 the debtor professionals who potentially --

14           THE COURT:  I don't necessarily disagree that it's

15 not fair to them, but part of the colloquy or the discussion

16 that we've had and, again, I have not ruled.  And, you know,

17 we were a little bit flip about it yesterday or earlier

18 today.  And I certainly appreciate all the progress.

19           But I think the discussion that I had was that, at

20 least, in my practice or in my, yeah practice, I guess, I try

21 not to get into that discussion pegging the number, but

22 reserving to myself a measure of flexibility.  That, you

23 know, and Mr. Johnson, I think, was at the podium at that

24 point and I can understand the heartburn that that would give

25 debtors' counsel in that context.

1          I guess the question I have does that gore your

2 ox?

3          MR. AGAY:  I think it does, Your Honor.

4          THE COURT:  How?

5          MR. AGAY:  Because --

6          THE COURT:  Because you're expecting their

7 services?

8          MR. AGAY:  I'm sorry?

9          THE COURT:  Because you're expecting their

10 services?

11          MR. AGAY:  Yes, yes.  In consummating a

12 transaction, we want them to be focused.  And we don't want

13 them to live with the fear that the committee is going to be

14 eating into their budget amount.

15          In addition, Your Honor, we want to fund less

16 rather than more.  And we don't want to be in a position

17 either in connection with the wind down budget or later on

18 where Your Honor awards some fees after the fee application

19 process and because our DIP is up to 14.9 million dollars,

20 we're being asked to fund that amount to pay the estate

21 professionals.

22          We candidly think that there should be -- they

23 should have to live within the means of their budget and I

24 believe we've made significant accommodations in order to

25 reduce the burn in these cases including capping our credit

1  bid, so as to take 363(k) off the table as a point of

2  investigation and contention.

3          So, like I said, before we broke, Your Honor,

4  we're just looking to streamline this case.

5          THE COURT:  I understand.

6          MR. AGAY:  And spend less rather than more and

7  focus our efforts on the business, focus the debtors' efforts

8  on the business, and put everybody within a rational budget.

9          THE COURT:  Can I ask you a question?  I think I

10 understood everything you went through.  Is that the sole

11 remaining contested issue between the parties as it relates

12 to the DIP in the 2004, at least with subject to any rights

13 being reserved for purposes of today that's the issue that we

14 have?

15         MR. AGAY:  I think so.

16         THE COURT:  Okay.  I understand.

17         MR. AGAY:  Okay.

18         THE COURT:  All right, thank you, Mr. Agay.

19         Mr. Hirsh.

20         MR. HIRSH:  Your Honor, good afternoon.  And also,

21 I think Mr. Agay forgot to mention that on the Chapter 5

22 commercial tort claims, et cetera, we're going to keep those

23 in the estate, vis-a-vie, the DIP and we're going to deal

24 with those -- for the purchaser had, we're going to deal with

25 that at the sale.

1           MR. AGAY:  Yeah, it would be -- Your Honor, David

2    Agay for the buyer.

3           We've agreed that we won't take leads on the

4    avoidance action, but we are buying those --

5           THE COURT:  Okay.  I understand.

6           MR. HIRSH:  And as far, also, the 2004 motion

7    goes, we don't want to withdraw the motion.

8           THE COURT:  I don't think -- here's, how I'm

9    viewing that.

10          I don't view that as withdrawn -- are giving you,

11   at least, some observations.  And Mr. Agay's comments about

12   the colloquy that you've had reflects that there's been

13   meaningful progress.

14          I'm not ruling on that.  And I think everybody in

15   the courtroom knows I understand the issue.  I understand the

16   relative urgency.  I understand the concerns.  I don't view

17   it as resolved, but I don't expect an additional motion.  I

18   understand where the parties are.

19          If you have issues at the end of your -- and I'm

20   not inviting this really.  There's nobody that likes

21   discovery disputes.  But if you have issues, my preference is

22   that you get me on the phone and I commit that I'll endeavor

23   to make myself available.

24          So, that motion is not withdrawn or disposed of.

25   I view it as progress being made and, again, I leave it to

1  you folks to figure out whether or not theirs, you know, it

2  goes far enough off the rails that you want to get me

3  involved. And, again, your rights are reserved in that

4  respect.

5          So, I understand that there's an investigation, a

6  discovery process that the parties are going to go through.

7  And I'll presume that that will play itself out.  And, again,

8  without having to deal with the status of that motion, I

9  don't think I'm being asked to enter an order on the 2004

10  motion today.  But, you know, again, if it goes off the

11  rails, get me on the phone and we'll get it back on the

12  rails.

13          MR. HIRSH:  Thank you, Your Honor.  The only

14  reason I raised it was to the extent Your Honor and, again, I

15  don't know the calendar in the next couple of weeks, but I

16  didn't know if you wanted to give us a holding date or

17  something that we could have just in case there was --

18          THE COURT:  I would rather not because I actually

19  have not been told what my schedule is for the next couple of

20  weeks.

21          MR. HIRSH:  That's perfectly --

22          THE COURT:  And, you know, obviously, we've got

23  the 4th coming up which falls on a Wednesday which makes

24  everything complicated.  But, at a minimum, what you're

25  talking about here is a teleconference.

1          MR. HIRSH:  That's --

2          THE COURT:  And I would, you know, even if I'm

3  traveling I don't think I'd have a real issue with making

4  myself available to the parties.

5          MR. HIRSH:  Thank you, Your Honor.

6          THE COURT:  Sure.

7          MR. HIRSH:  Look, just to respond to Mr. Agay on

8  the fees and it's an uncomfortable discussion and many times

9  I wear a DIP lender's counsel hat, as Your Honor knows.

10          But, look, there's $4.3 million dollars already

11  budgeted for all professionals in this case.  We are not

12  looking to do anything out of the ordinary.  We're not

13  looking to do anything that is not what Your Honor sees

14  typically.  But, you know, we are in a very compressed

15  timeframe.

16          And the concerns that the committee's

17  professionals collectively have here is, you know -- and I

18  don't blame Mr. Agay, and I'll use the word anyway.  There's

19  nothing wrong trying to squeeze us into a budget, but that

20  could, frankly, harm us in what we're trying to do in an

21  extremely short period of time.

22          THE COURT:  Here's what I'd like to do with that.

23  I want to think about that.  I've shared with you sort of

24  generally how I played with it or how I've dealt with that

25  issue in other cases.  This is not the first time this has

1   come up.

2          I understand the concerns that are expressed.

3   It's not been pressed to me for a decision.  And I think, you

4   know, frankly, the lender and I assume debtors' counsel and

5   the committee are entitled to a decision on that.  I want to

6   think about it.

7          One of the reasons that it's not really just

8   thinking about it, it's more I would like to confer with some

9   of my colleagues.  You mentioned a proceeding before Judge

10  Walrath.  You know, every decision falls on its own facts.

11  I'll confess I'll probably touch base with them to see what

12  their thoughts are.

13          But I will say this, regardless of how I decide

14  it, I think that 99 percent of the legwork associated with

15  the DIP order and the 2004 in the process going forward to

16  the sale is covered by the comments that have been reported

17  by Mr. Agay and reported by you.

18          I'm not trying to leave anybody hanging and I'm

19  not trying to complicate the process for anybody else.  So,

20  I'd like to think about that.  I will likely give you my

21  answer in the morning, but I don't think I need anymore

22  argument from the parties on it.  I know where everybody

23  stands.  I think you can finalize the order subject to, you

24  know, an order that either has the word not or doesn't.

25          And, again, I'll let you know first thing in the

1 morning on that.  Probably by correspondence -- maybe even

2 from my courtroom deputy.  The answer is just yes or no or

3 here is how I want to deal with it.  And I would expect that

4 the parties will build that in.

5         I understand the concerns that the committee has

6 expressed and I certainly hear and appreciate debtors'

7 counsel -- debtors' professionals' concerns, as well as Mr.

8 Agay's concern.  So, I think I know where we stand.

9         MR. HIRSH:  Thank you, Your Honor.  I appreciate

10 that.

11         THE COURT:  Okay.  Mr. Johnson.

12         MR. JOHNSON:  Yes, Your Honor, Jeremy Johnson from

13 Polsinelli.

14         So, I guess, the only item of business is we need

15 to conform the order.  We need to make some more additional

16 changes to reflect the deal today and we'll work on getting

17 those.  I know you've got a 4:30 hard stop, so we'll get

18 those --

19         THE COURT:  You don't have to like the payroll or

20 anything today.

21         MR. JOHNSON:  No, we're not going to get it done

22 in the next 25 minutes.

23         THE COURT:  Well, you're not going to get it done

24 in the next hour either.

25         MR. JOHNSON:  Yeah, no.  In our case, Your Honor,

1  you might be right there.  So, we'll plan on submitting

2  something in the morning.  And we may just wait to hear from

3  Your Honor regarding that one issue and then put all those

4  issues together.

5           THE COURT:  I'll commit to you that we'll have an

6  answer to you by probably 9:00, 9:30 tomorrow morning.

7           MR. JOHNSON:  Thank you, Your Honor.

8           THE COURT:  And you're going to have the order,

9  otherwise, ready and the certification and I'll get it

10  entered promptly and we'll go from there.

11          But, again, it's an issue that's not new to me,

12  but you presented it and I think you're entitled to, you

13  know, let me consider it a little bit.

14          MR. JOHNSON:  We appreciate that, Your Honor.

15          THE COURT:  Sure.

16          MR. JOHNSON:  That's all we have.

17          THE COURT:  Mr. Johnson, do we have anything

18  further today?

19          MR. JOHNSON:  I don't think we have anything

20  further, Your Honor.

21          THE COURT:  All right, I appreciate everyone's

22  time.  We'll stand in recess.  Thank you much.  I'll look for

23  the order.

24          (Proceedings conclude at 4:00 p.m.)

25

1                               CERTIFICATE

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6
     /s/Mary Zajaczkowski                      June 27, 2018
7    Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25